Timothy J. Preso
Amanda D. Galvan
Earthjustice
P.O. Box 4743
Bozeman, MT 59722-4743
(406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org
agalvan@earthjustice.org

*Attorneys for Plaintiffs in Case No. 20-181*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Lead Case No. CV 20–181–M–DWM |
| v. | ) ) | Member Case No. CV 20-183-M-DWM |
| DEB HAALAND, et al., | ) ) | |
| Defendants. | ) ) | |
| WILDEARTH GUARDIANS, et al., | ) ) ) | **BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY** |
| Plaintiffs, | ) ) | **JUDGMENT IN NO. CV 20-181-M-DWM** |
| v. | ) ) | |
| DEB HAALAND, et al., | ) ) | |
| Defendants. | ) ) | |

# TABLE OF CONTENTS

I.   THE SERVICE ARBITRARILY DEEMED THE LOWER-48
     WOLVERINE POPULATION NOT TO CONSTITUTE A
     LISTABLE POPULATION SEGMENT UNDER THE ESA ..................... 3

     A.   The ESA's Provision for Listing a Distinct Population Segment ....... 4

     B.    The Service's Flip-Flopping on the Segment Issue .......................... 6

     C.   The Service's Segment Analysis Violated the ESA ......................... 10

          1.   The Service Failed to Rationally Explain Its Reversal of
               Its Prior Findings Regarding Differences in Wolverine
               Conservation Status Across the U.S.-Canada Border ........... 11

               a.   Small Total Population Size ......................................... 12

               b.   Inadequate Effective Population Size ........................... 16

               c.   Habitat Fragmentation ................................................. 21

          2.   The Service Also Arbitrarily Determined That the
               Lower-48 Wolverine Population is Not Markedly
               Separate from the Canadian Population ................................. 27

II.  THE SERVICE ARBITRARILY REJECTED THREATS TO THE
     WOLVERINE ESTABLISHED BY THE BEST AVAILABLE
     SCIENCE ................................................................................................... 31

III. THE COURT SHOULD REMEDY THE SERVICE'S ESA
     VIOLATIONS BY VACATING AND REMANDING THE
     WITHDRAWAL DECISION WITH A 12-MONTH DEADLINE ........... 31

CONCLUSION ................................................................................................... 35

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alaska Ctr. for the Env't v. Browner,
  20 F.3d 981 (9th Cir. 1994) .................................................................33

All. for the Wild Rockies v. U.S. Forest Serv.,
  907 F.3d 1105 (9th Cir. 2018) ............................................................31

Am. Acad. of Pediatrics v. U.S. Food & Drug Admin.,
  330 F. Supp. 3d 657 (D. Mass. 2018).................................................35

Defs. of Wildlife v. Babbitt,
  958 F. Supp. 670 (D.D.C. 1997).........................................................24

Defs. of Wildlife v. Jewell,
  176 F. Supp. 3d 975 (D. Mont. 2016)..........................................passim

Defs. of Wildlife v. Kempthorne,
  CV 05-99-M-DWM, slip. op. (D. Mont. 2006).................................33

Defs. of Wildlife v. Salazar,
  Civ. No. 08-139-M-DWM (D. Mont. filed June 10, 2009).................7

FCC v. Fox Television Stations, Inc.,
  556 U.S. 502 (2009).....................................................................10, 15

Kern Cnty. Farm Bureau v. Allen,
  450 F.3d 1072 (9th Cir. 2006) ............................................................15

Nat'l Ass'n of Home Builders v. Norton,
  340 F.3d 835 (9th Cir. 2003) ..........................................................5, 29

Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,
  524 F.3d 917 (9th Cir. 2008) ..............................................................32

Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,
  No. CV 01–640–RE, CV 05–23–RE, 2005 WL 2488447 (D. Or.
  Oct. 7, 2005), aff'd, 524 F.3d 917 (9th Cir. 2008) .......................33, 34

Nw. Coal. for Alternatives to Pesticides v. EPA,
  544 F.3d 1043 (9th Cir. 2008) ............................................................13

Nw. Env't Def. Ctr. v. Bonneville Power Admin.,
    477 F.3d 668 (9th Cir. 2007) ...............................................................29

Or. Nat. Res. Council v. Allen,
    476 F.3d 1031 (9th Cir. 2007) ...............................................10, 28, 30

Organized Vill. of Kake v. U.S. Dep't of Agric.,
    795 F.3d 956 (9th Cir. 2015) (en banc) ................................10, 15, 25

Pollinator Stewardship Council v. U.S. Env't Prot. Agency,
    806 F.3d 520 (9th Cir. 2015) ...............................................................32

Sierra Club v. U.S. EPA,
    850 F. Supp. 2d 300 (D.D.C. 2012)......................................................35

Sw. Ctr. for Biological Diversity v. Babbitt,
    926 F. Supp. 920 (D. Ariz. 1996) ...........................................................4

## STATUTES AND LEGISLATIVE MATERIALS

16 U.S.C.
    § 1531 et seq. ..........................................................................................2
    § 1532(6)..................................................................................................4
    § 1532(16)................................................................................................4
    § 1532(20)................................................................................................4
    § 1533(a)(1)............................................................................................31
    § 1533(a)(1)(D).......................................................................................12
    § 1533(b)(1)(A)...............................................................................passim
    § 1533(b)(6)(A).......................................................................................35
    § 1536(a)(4)............................................................................................32

H.R. Rep. No. 93-412 (1973).......................................................................5

S. Rep. No. 96-151 (1979) ...........................................................................5

## REGULATIONS AND ADMINISTRATIVE MATERIALS

40 Fed. Reg. 31,734 (July 28, 1975)............................................................5

43 Fed. Reg. 6,230 (Feb. 14, 1978) ..............................................................5

61 Fed. Reg. 4,722 (Feb, 7, 1996) .......................................................passim

68 Fed. Reg. 60,112 (Oct. 21, 2003)...........................................................7

73 Fed. Reg. 12,929 (Mar. 11, 2008).........................................................7

75 Fed. Reg. 78,030 (Dec. 14, 2010)...............................................*passim*

78 Fed. Reg. 7,864 (Feb. 4, 2013) ..........................................................8

79 Fed. Reg. 47,522 (Aug. 13, 2014)....................................................9, 25

85 Fed. Reg. 64,618 (Oct. 13, 2020)................................................*passim*

### OTHER AUTHORITIES

Douglas H. Chadwick, <u>The Wolverine Way</u> (2010)...................................1

<u>Note on Administrative Record Citations</u>

Plaintiffs cite documents from the U.S. Fish and Wildlife Service ("Service") record using the Bates page number(s) for the cited material. These documents, as produced by the Service, use Bates page numbers that include the prefixes "FWS," "PI," and "LIT," with the latter two prefixes followed by a hyphen.

This case concerns the continued existence in the lower-48 United States of an icon of the snowy northern wilderness—the North American wolverine.  This largest terrestrial member of the weasel family combines legendary toughness with a remarkable capacity to traverse rugged country.  Although the biggest males weigh only about 40 pounds, wolverines "never back down, not even from the biggest grizzly, and least of all from a mountain."  Douglas H. Chadwick, The Wolverine Way 47 (2010).

Today, however, the wolverine's unmatched tenacity faces unprecedented challenges.  The remaining wolverines in the contiguous United States are estimated to number only 250-300 individuals primarily occupying the northern Rockies and north Cascades.  In these areas, wolverines are widely scattered across mountaintop habitat fragments and are frequently isolated from other members of their species.  These circumstances leave wolverines vulnerable to localized extinctions and a downward spiral of inbreeding.  Wolverines seeking to cross between habitat patches must run a gauntlet of human developments as well as lethal traps set for other species.  And a growing body of scientific information demonstrates that a warming climate will only worsen these threats by eliminating deep, persistent snowpack—a defining feature of the remaining wolverine habitat in the lower 48.

Five years ago, this Court, per Judge Christensen, catalogued the compelling scientific evidence of these threats to the wolverine and recognized "the writing on the wall for this snow-dependent species standing squarely in the path of global climate change." Defs. of Wildlife v. Jewell, 176 F. Supp. 3d 975, 1011 (D. Mont. 2016); see also id. at 1006 (acknowledging "a grim genetic picture for the wolverine in the United States"). The Court therefore remanded and vacated a 2014 decision by the U.S. Fish and Wildlife Service that withdrew a 2013 proposed rule to list the wolverine population in the lower-48 states as a threatened species under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq. See 176 F. Supp. 3d at 1011-12. In so doing, this Court stated: "if there is one thing required of the Service under the ESA, it is to take action at the earliest possible, defensible point in time to protect against the loss of biodiversity within our reach as a nation. For the wolverine, that time is now." Id. at 1011.

The Service's response was to delay for more than four years until prodded by litigation from Plaintiffs, and then to attempt yet another withdrawal of the proposed wolverine listing. See 85 Fed. Reg. 64,618 (Oct. 13, 2020) (the "Withdrawal"). This Withdrawal represented only the most recent in a series of Service delays and evasions regarding the wolverine listing that now extend back more than two decades and have consistently required judicial correction to vindicate the mandates of the ESA. Today judicial correction of the Service's

unlawful conduct is once again required, and Plaintiffs turn to this Court for relief

on their own behalf and on behalf of the threatened wolverine.[1]

## I.   THE SERVICE ARBITRARILY DEEMED THE LOWER-48 WOLVERINE POPULATION NOT TO CONSTITUTE A LISTABLE POPULATION SEGMENT UNDER THE ESA

The Service's Withdrawal erred at the outset by irrationally reversing the

agency's prior conclusions and determining that the lower-48 wolverine population

does not constitute a "distinct population segment" ("segment") eligible for listing

as an endangered or threatened species under the ESA.  The agency's negative

decision on this issue discarded a prior, positive segment finding for the lower-48

wolverine population that the agency announced in 2010 and twice reaffirmed

since then.  Further, the Service's negative segment determination in the

Withdrawal recycled misguided reasoning from a 2008 Service finding that the

agency declined to defend when it was previously challenged before this Court.

This reversion to a rationale that the Service itself deemed indefensible more than

13 years ago illustrates the increasingly tenuous nature of the agency's evasions as

its campaign to avoid listing the lower-48 wolverine population under the ESA

enters a third decade.  This Court should reject the Service's flawed rationale and

remand the Withdrawal for a new segment determination.

---

[1] The background of this case is set forth in Plaintiffs' Joint Statement of Undisputed Facts in Support of Motions for Summary Judgment ("Statement of Facts").

**A.      The ESA's Provision for Listing a Distinct Population Segment**

To be protected by the ESA, a species must first be listed as endangered or threatened.  The ESA defines "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  Id. § 1532(20).  The ESA defines "species" to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature."  Id. § 1532(16).  Thus, the ESA authorizes the Service to list as endangered or threatened a distinct population segment of a vertebrate species.

In this regard, the ESA's text and legislative history reflect a "consistent policy decision by Congress that the United States should not wait until an entire species faces global extinction before affording a domestic population segment of a species protected status."  Sw. Ctr. for Biological Diversity v. Babbitt, 926 F. Supp. 920, 924 (D. Ariz. 1996).  Thus, in establishing that a species may be deemed endangered or threatened based on threats "throughout . . . a significant portion of its range," 16 U.S.C. § 1532(6), (20), Congress sought to provide for "the possibility of declaring a species endangered within the United States where its principal range is in another country, such as Canada or Mexico, and members

of that species are only found in this country insofar as they exist on the periphery

of their range." H.R. Rep. No. 93-412, at 10 (1973). Similarly, in authorizing the

listing of distinct population segments, Congress recognized "that there may be

instances in which [the Service] should provide for different levels of protection

for populations of the same species. For instance, the U.S. population of an animal

should not necessarily be permitted to become extinct because the animal is more

abundant elsewhere in the world." S. Rep. No. 96-151 (1979), reprinted in A

Legislative History of the Endangered Species Act, 97th Cong., 2d Sess. 1391,

1397 (1982). This statutory authority to provide differing levels of protection to

different populations is a key feature of the ESA that, among other things,

safeguards the biodiversity of the lower-48 United States. Many of the most

prominent ESA-protected species, including the grizzly bear and bald eagle, were

listed as imperiled in the lower-48 states despite more robust populations in Alaska

and Canada. See Amendment Listing the Grizzly Bear of the 48 Conterminous

States as a Threatened Species, 40 Fed. Reg. 31,734 (July 28, 1975); see

also Determination of Certain Bald Eagle Populations as Endangered or

Threatened, 43 Fed. Reg. 6,230 (Feb. 14, 1978).

Congress did not define "distinct population segment" in the ESA, and the

term has no generally accepted scientific meaning. See Nat'l Ass'n of Home

Builders v. Norton, 340 F.3d 835, 842 & n.8 (9th Cir. 2003). In 1996, the Service

issued a policy interpreting "distinct population segment" that requires

consideration of the discreteness of the population segment in relation to the

remainder of the species; the significance of the population segment to the species;

and the population segment's conservation status in relation to the ESA's standards

for listing.  61 Fed. Reg. 4,722, 4,725 (Feb. 7, 1996).  With respect to discreteness,

"[t]he standard established for discreteness is simply an attempt to allow an entity

given DPS status under the Act to be adequately defined and described."  Id. at

4,724.  A population may be discrete if it meets one of the following conditions:

> 1. It is markedly separated from other populations of the same taxon
> as a consequence of physical, physiological, ecological, or behavioral
> factors. Quantitative measures of genetic or morphological
> discontinuity may provide evidence of this separation.
>
> 2. It is delimited by international governmental boundaries within
> which differences in control of exploitation, management of habitat,
> conservation status, or regulatory mechanisms exist that are
> significant in light of section 4(a)(1)(D) of the Act.

Id. at 4,725.  The Service must make its segment and other ESA listing

determinations "solely on the basis of the best scientific and commercial data

available . . . after conducting a review of the status of the species."  16 U.S.C. §

1533(b)(1)(A).

### B.   The Service's Flip-Flopping on the Segment Issue

The Service's application of its segment policy to the lower-48 wolverine

population has been characterized by a series of flip flops culminating in the

challenged Withdrawal that returns the agency to an illegitimate position it initially took in 2008 but then abandoned and reversed upon being challenged.

The Service first made a segment determination regarding the lower-48 wolverine population after this Court overturned the agency's initial, negative 90-day finding on the wolverine listing petition and directed the agency to prepare a 12-month finding.  See 73 Fed. Reg. 12,929, 12,929-30 (Mar. 11, 2008).[2]

In that 12-month finding, the Service never addressed whether the lower-48 wolverine population constitutes an endangered or threatened species but instead terminated its inquiry upon determining that this population "does not constitute a distinct population segment."  Id. at 12,941.  Despite acknowledging numerous differences between the conservation status of wolverine populations on either side of the U.S.-Canada border, the Service repeatedly deemed such differences insignificant to the segment inquiry.  See id. at 12,936-39.  Yet when conservation groups, including many of the Plaintiffs in this case, challenged that determination, the Service declined to defend it, instead settling that challenge by agreeing to issue a new 12-month finding by December 1, 2010.  See Doc. 19-2, Stipulated Settlement Agreement, Defs. of Wildlife v. Salazar, Civ. No. 08-139-M-DWM (D. Mont. filed June 10, 2009).

---

[2] The Service's unlawful 90-day finding claimed that a "lack of information prevents us from determining whether wolverines in the contiguous United States constitute" a segment.  68 Fed. Reg. 60,112, 60,114 (Oct. 21, 2003).

The Service's new 12-month finding in 2010 reversed course on the segment issue, determining that the lower-48 wolverine population satisfied segment criteria and warranted listing due to the predicted impacts of climate change and other factors—but deemed further progress toward listing "precluded by higher priority listing actions."  75 Fed. Reg. 78,030, 78,054 (Dec. 14, 2010). Nevertheless, the Service determined that the lower-48 wolverine population was discrete from the wolverine population north of the Canadian border because of the lower-48 population's much smaller numbers, reduced genetic diversity, and more fragmented habitat, all of which constituted differences in conservation status that necessitated greater regulatory protections for the lower-48 population and therefore justified segment status.  See id. at 78,037-40.[3]

Subsequently, the Service twice reaffirmed its 2010 segment determination for the lower-48 wolverine population.  First, in its 2013 proposed rule to list the lower-48 wolverine population as a threatened species under the ESA, the Service incorporated by reference its segment analysis from the 2010 12-month finding and reiterated that differences in the wolverine's conservation status across the U.S.-Canada border satisfied the discreteness criterion.  See 78 Fed. Reg. 7,864, 7,873 (Feb. 4, 2013).  Second, in its 2014 withdrawal of that proposed listing rule, the

---

[3] The Service also determined that the lower-48 wolverine population satisfied the significance criterion for a segment designation.  See 75 Fed. Reg. at 78,040-42.

Service referenced and incorporated the 2010 finding "for a detailed evaluation of the wolverine under our DPS policy." 79 Fed. Reg. 47,522, 47,523 (Aug. 13, 2014). Thus, even in its prior attempt to withdraw the proposed wolverine listing—which this Court deemed unlawful for numerous reasons, see Defs. of Wildlife, 176 F. Supp. 3d at 1000-07—the Service did not attempt to question whether the lower-48 wolverine population satisfied segment requirements.

Notwithstanding the thrice-confirmed nature of its positive segment determination for the lower-48 wolverine population, the Service reversed course again in the challenged Withdrawal. The Service's new segment determination essentially returned the agency to where it started in 2008, cataloging numerous differences in the conservation status of the lower-48 wolverine population from the population north of the Canadian border, but deeming them insignificant to the segment analysis. See 85 Fed. Reg. at 64,628-31. Based on its asserted reasoning, the Service determined the lower-48 wolverine population does not satisfy the discreteness criterion for a segment designation and therefore did not conduct an analysis of significance. See id. at 64,631.[4]

---

[4] The record does not disclose the Service's motivation for reversing its 2010 segment determination, apart from pressure by Idaho. See FWS0047178; see also Defs. of Wildlife, 176 F. Supp. 3d at 1000 (stating Court's suspicion that "immense political pressure" from "a handful of western states" drove negative wolverine-listing decision).

## C.     The Service's Segment Analysis Violated the ESA

The Service's discreteness analysis in the Withdrawal represented an irrational reversal of the agency's 2010 segment finding, repeatedly overlooked the best available science contradicting its conclusions, and therefore violated the ESA.  In this regard, while an agency's decision always must consider the "important aspect[s]" of the problem it is confronting and reflect "a rational connection between the facts found and the choices made," Oregon Natural Res. Council v. Allen, 476 F.3d 1031, 1036 (9th Cir. 2007), where, as here, an agency reverses a prior policy conclusion based on new factual findings, it must offer "'a reasoned explanation … for disregarding facts and circumstances that underlay or were engendered by the prior policy.'"  Organized Vill. of Kake v. U.S. Dep't of Agric., 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515-16 (2009)).

The Service's segment analysis in the Withdrawal fails to pass muster under these standards.  The Service's conclusion that differences in the wolverine's conservation status across the U.S.-Canada border do not satisfy the discreteness requirement for a segment designation failed to rationally explain the agency's reversal of its prior, diametrically opposite findings on this issue.  Further, the Service arbitrarily determined that the lower-48 wolverine population may not be

10

deemed discrete for the independent reason that it is markedly separate from more northerly populations.

       1.    The Service Failed to Rationally Explain Its Reversal of Its Prior Findings Regarding Differences in Wolverine Conservation Status Across the U.S.-Canada Border

The Service offered no rational explanation for abandoning its prior findings that the disparate conservation statuses of wolverines in the lower-48 states and Canada justified designation of the lower-48 population as discrete. See 61 Fed. Reg. at 4,725 (providing that population may be deemed discrete based on "differences in … conservation status … that are significant in light of [ESA] section 4(a)(1)(D)"). The Service's 2010 segment determination found "that differences in conservation status of the wolverine between the United States and Canada are substantial and significant in light of section 4(a)(1)(D)" of the ESA. 75 Fed. Reg. at 78,037. These differences arise from the fact that "wolverines exist in well-distributed, interconnected, large populations" in Canada, but "wolverine populations in the remaining U.S. range appear to be at numbers so low that their continued existence could be at risk." Id. As the 2010 finding explained, this risk to the wolverine's continued existence stems from three factors: "(1) Small total population size; (2) effective population size below that needed to maintain genetic diversity and demographic stability; and (3) the fragmented nature of wolverine habitat in the contiguous United States[.]" Id. The 2010

finding concluded that, because of these factors, "maintaining wolverines within their native range in the contiguous United States into the future is likely to require regulatory mechanisms that are not currently in place," and therefore these factors are significant in light of ESA section 4(a)(1)(D).  Id.; see also 16 U.S.C. § 1533(a)(1)(D) (providing that species may be deemed endangered or threatened based on "inadequacy of existing regulatory mechanisms").

The Service's 2020 Withdrawal reaffirmed the existence of these factors, but sought to explain them away to support a finding that they were insignificant in light of ESA section 4(a)(1)(D).  See 85 Fed. Reg. at 64,629-31.  However, the Service's proffered explanations fail basic standards for rational decision making and defy the best available science.

a.      Small Total Population Size

The Service's Withdrawal did not question the 2010 finding's conclusion that "[t]here are many fewer wolverines in the contiguous United States than there are in Canada and Alaska," 85 Fed. Reg. at 64,629—i.e., an estimated total of approximately 300 individuals in the lower-48 states compared to nearly 19,000 in western Canada alone, 75 Fed. Reg. at 78,037, 78,040—but the Service deemed this disparity "more a reflection of the amount of suitable habitat available within the contiguous United States" than "a reflection of poor conservation status."  85 Fed. Reg. at 64,629.  The Service further claimed that "new information" now

justifies a conclusion that "the contiguous United States wolverines represent a peripheral population at the southern extent of the North American wolverine range" and their small population is "a natural result of habitat fragmentation and not reflective of a difference in conservation status."  Id.

The Service's conclusion is irrational and contrary to law.  The agency's central thesis that the wolverine's small population size in the lower-48 states is not significant for conservation because it results from the population's occupation of a small amount of fragmented habitat at the periphery of the species' range is a non sequitur.  As the 2010 finding recognized, the wolverine's small population in the lower-48 states "is significant because critically small populations such as those in the contiguous United States face higher extinction risk than large ones such as the Canada-Alaska population."  75 Fed. Reg. at 78,037.  This risk is only magnified by the population's occupation of limited, fragmented habitat because that threatens "lack of connectivity between subpopulations," which causes genetic isolation and makes remaining populations more vulnerable to "external threats." Id. at 78,038-39.  Thus, the Service's own findings support, rather than disprove, a difference in conservation status based on small population size.  See Nw. Coal. for Alternatives to Pesticides v. EPA, 544 F.3d 1043, 1052 n.7 (9th Cir. 2008) (stating that court must "disapprove the agency's action" where its reasoning is

"not supported by the data it purports to interpret") (quotation and citation omitted).

The Service's Withdrawal offered no reason to doubt the continuing legitimacy of the agency's 2010 conclusions on this issue. The Service claimed that "wolverines in the contiguous United States are considered to be a metapopulation connected with wolverine populations in Canada." 85 Fed. Reg. at 64,629. Yet the scientific source cited by the agency to support this assertion— Inman, et al. (2013), at page 277 (cited in 85 Fed. Reg. at 64,629)—makes no such assertion, see FWS0030724, and the Service ignored more pertinent scientific evidence, including a 2019 study by Sawaya, et al., documenting that its genetic analysis, together with similar past studies, indicate that Canada's Trans-Canada Highway "could be a continental barrier to female wolverine movement with potential implications for wolverine conservation in southern Canada and the United States." FWS0049089 (emphasis added). Further, a 2019 study by Mowat, et al., documented unsustainable trapping of wolverines in southeast British Columbia and southwest Alberta, yielding extremely low wolverine population densities along the Canadian side of the international border. See FWS0048778; FWS0048779 (wolverine density map); see also FWS0006197 (Canadian biologist advising that "generally the densities are very low" in southern Alberta and British Columbia). A similar scientific study of the same region also documented low

14

wolverine densities in southern Alberta and British Columbia and stated "concern given the current status of wolverines in the contiguous US and reliance on immigration from Canadian populations."  FWS0006586.  The Service's disregard of such scientific evidence contradicting its conclusion of connectivity is arbitrary and violates the ESA's best-available-science requirement, 16 U.S.C. § 1533(b)(1)(A); see Kern Cnty. Farm Bureau v. Allen, 450 F.3d 1072, 1080 (9th Cir. 2006) (stating that ESA best-available-science requirement prohibits the Service "from disregarding available scientific evidence that is in some way better than the evidence it relies on") (quotation, alteration, and citation omitted).

Further, the Service's contention that "new information" indicates the "peripheral" status of the lower-48 population, 85 Fed. Reg. at 64,629, fails to provide a "reasoned explanation" for abandoning prior conclusions.  Organized Vill. of Kake, 795 F.3d at 968 (quotation and citation omitted).  Contrary to the Service's statement that this description is "based on new information," 85 Fed. Reg. at 64,629, the Service described the peripheral nature of the lower-48 wolverine population in its 2010 segment finding more than a decade ago, see 75 Fed. Reg. at 78,041.  The Service cannot rationally explain its reversal by repackaging a long-understood fact about the lower-48 wolverine population as new information.  See FCC v. Fox Television Stations, Inc., 556 U.S. at 537 ("An agency cannot simply disregard contrary or inconvenient factual determinations

that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate.") (Kennedy, J., concurring).[5]

> b.    Inadequate Effective Population Size

The Service also acted irrationally and unlawfully in dismissing the significance of the difference in conservation status between the lower-48 and Canadian wolverine populations reflected by the extremely small effective population size of the lower-48 population.

Effective population size refers to "the number of individuals in a population that contribute offspring to the next generation."  85 Fed. Reg. at 64,629.  The Service's 2010 segment determination noted the "exceptionally low" effective population size of the lower-48 wolverine population in the Rocky Mountains— averaging only 39 individuals—and found that it was "below what is thought necessary for short-term maintenance of genetic diversity."  75 Fed. Reg. at 78,037.  The 2010 determination also observed that resulting impacts to genetic diversity are already apparent through ongoing "genetic drift" characterized by lower genetic diversity in the lower-48 population than the Canadian population. Id. at 78,038.  The 2010 determination concluded that these characteristics "result

---

[5] The peripheral nature of the lower-48 wolverine population also does not undermine its conservation importance.  Peripheral populations often constitute the last strongholds of imperiled species and therefore "[a]vailable scientific data support the importance of peripheral populations for conservation."  75 Fed. Reg. at 78,041.

in high extinction risk," rendering the lower-48 wolverine population far more "fragile" than relatively abundant and well-connected Canadian populations.  Id.

Nevertheless, in its Withdrawal, the agency retreated from its own prior conclusions to assert that the small effective population size of the lower-48 wolverine population is not a conservation concern.  85 Fed. Reg. at 64,629.  The Service attempted to justify this assertion primarily by claiming that wolverines in the lower-48 states are not "genetically isolated from wolverines on the other side of the international border in Canada."  Id.

However, the Service's conclusion on this issue was fundamentally flawed because the best available scientific information showing genetic variation across the international border confirms a difference in conservation status between the lower-48 and Canadian populations based on genetic vitality.  In claiming otherwise, the Service pointed to studies determining that all 45 wolverines identified in a 2015-17 survey in Montana, Wyoming, and Idaho matched a single haplotype, Wilson-A, and all five wolverines examined in Washington matched another single haplotype, Wilson-C, and deemed these findings supportive of its position because they indicated that "all contiguous United States historical (pre-1900) and recent wolverine populations are likely descendants of immigrants from

Canada."[6]  Id. at 64,630.  However, the Service failed to rationally address the more pertinent point that the number of haplotypes detected in the lower-48 wolverine population is a small fraction of the genetic diversity documented in the Canadian population.  As the Service's 2010 segment determination documented, scientific studies have concluded that wolverines in the lower-48 states contain only 3 of 13 haplotypes found in Canadian populations.  75 Fed. Reg. at 78,038. The Service recognized in its 2010 determination that "[t]he reduced number of haplotypes [in the lower-48 population] indicates not only that genetic drift is occurring, but also that there is some level of genetic separation [between lower-48 and Canadian populations]; if these populations were freely interbreeding, they would share more haplotypes."  75 Fed. Reg. at 78,038.  The Service in its 2020 Withdrawal failed even to attempt to justify a different conclusion in claiming that lower-48 wolverines are not genetically isolated from Canadian populations.

Instead, the Service appeared to posit that the wolverine's ability to disperse across long distances, including by traversing unsuitable habitats, negates any conservation concerns arising from such genetic discontinuity.  See 85 Fed. Reg. at 64,630.  In so doing, the Service again ignored the best available scientific information in violation of 16 U.S.C. § 1533(b)(1)(A).  The Service asserted that

---

[6] Haplotypes refer to "sets of closely linked genetic markers that are inherited together."  75 Fed. Reg. at 78,038.

its "analysis of trapping levels" does not support an assumption "that trapping in Canada near the border acts as a barrier to wolverine movement into the contiguous United States." 85 Fed. Reg. at 64,630. As discussed supra, however, this conclusion simply disregards published scientific evidence in the Mowat, et al. (2019) and similar studies documenting that trapping impacts in southern Alberta and British Columbia were unsustainable and yielded extremely low wolverine densities in these Canadian regions, as well as the Sawaya, et al. (2019) study indicating that a different obstacle, the Trans-Canada Highway, creates a significant barrier to genetic continuity between wolverines to the north and south. See also FWS0027091-94 (Fisher, et al. (2013) study documenting reduced wolverine occupancy near human infrastructure). The Service also failed to consider another recent scientific study, Kukka, et al. (2017), documenting that Canadian wolverine trapping disproportionately removed young males that are most likely to disperse into new areas and thus contribute to genetic connectivity between the Canadian and lower-48 populations. FWS0033547. For these reasons alone, the Service's dismissal of any conservation risk resulting from the genetic discontinuity between the lower-48 and Canadian populations was irrational and unlawful.

Yet the Service also irrationally relied on a few recent documentations of long-distance movements by male wolverines to suggest "some level of

connectivity (and potential gene flow) between currently occupied habitat … and

unoccupied habitat within the wolverine's historical range." 85 Fed. Reg. at

64,630. Specifically, the agency pointed to one male wolverine's movement from

Wyoming to Colorado and then to North Dakota. Id. at 64,629-30. The Service

also pointed to a few documented wolverine movements across the Canadian

border and claimed that a single male wolverine observed in California "also

represents evidence of connectivity between wolverine populations of the Rocky

and Sierra Nevada Mountain Ranges," id. at 64,630—even though the Service

elsewhere admitted that there is no wolverine population in the Sierra Nevada, id.

at 64,632, 64,633 (maps of wolverine occurrence).

The Service's reliance on these limited long-distance dispersals to "provide

evidence for connectivity," id. at 64,630, overlooks the fact that, while a few male

wolverines have traversed human-altered landscapes, others have been less

successful, see FWS0047177; FWS0009731; FWS0006734 (documenting road-

killed wolverines in Utah and Montana). Further, the Service's analysis again

ignored Sawaya, et al. (2019)'s documentation of the barrier impacts caused by the

Trans-Canada Highway as well as another recent study, Scrafford, et al. (2018),

documenting wolverine avoidance of roads. See FWS0038735-36. More

fundamentally, however, the Service's invocation of a handful of long-distance

male dispersals overlooks an essential element required for "connectivity" and

"gene flow": the presence of a female wolverine in the same region as a dispersing male to allow for reproduction.  See 85 Fed. Reg. at 64,639 ("wolverine population distributions are primarily limited by dispersal of the more philopatric sex (females)").  Indeed, one of the scientific studies that the Service cited to support its assertions, Inman, et al. (2013), see id. at 64,630, itself noted that the dispersing wolverines in the instances cited by the Service were lone males and that female dispersal across similar distances "is likely to be so infrequent (if possible) that it may be of limited value in establishing or maintaining populations."  FWS0030731 (emphasis added); see also FWS0052999-53000 (California comment on Service analysis disputing assertion that male wolverine dispersal to Sierra Nevada provides evidence of population recovery; similar dispersal "is extremely unlikely for a female wolverine").  The recent Sawaya, et al. (2019) study—which, again, the Service entirely disregarded—reinforces this conclusion, documenting that highway infrastructure constitutes a substantial barrier to female wolverine movement.  FWS0049088.  The Service's disregard for this relevant scientific information, including information in the very scientific source material the agency purported to rely on, further undermines its dismissal of the threat that genetic discontinuity poses to the already genetically impoverished lower-48 wolverine population.

c.     Habitat Fragmentation

Like its findings related to small population and low effective population, the Service's conclusion regarding habitat fragmentation—that wolverine habitat fragmentation in the lower-48 states is not a significant difference in conservation status from Canada, 85 Fed. Reg. at 64,631—disregarded, misinterpreted, and failed to rationally analyze the best available science.

The Service's 2010 segment determination observed that the fragmented nature of high-elevation, snowy wolverine habitat in the lower-48 states results in smaller, "'sky island'" patches separated by lower-elevation, unsuitable valley habitats as compared to more connected and contiguous habitat in Canada.  75 Fed. Reg. at 78,037, 78,038.  Maintaining the lower-48 wolverine population therefore requires exchange of individual wolverines between islands of snowy, mountainous habitat to avoid inbreeding or local extinction, unlike in Canada where exchange of individuals across more contiguous and larger habitats is both more likely and less critical for long-term maintenance of those populations.  Id. at 78,038.  Yet "[i]ntermountain valleys are increasingly becoming the sites of human residential and commercial developments and transportation corridors" that represent barriers to wolverine movement in the lower 48.  Id.  Accordingly, the Service concluded in 2010, "[t]he fragmented nature and distribution of wolverine habitat in the contiguous United States results in a population that is highly

22

vulnerable to extirpation because of lack of connectivity between subpopulations" and "external threats." Id. at 78,039.

In the Withdrawal, the Service sought to minimize the obvious differences between lower-48 and Canadian wolverine habitat by attempting to cast doubt on its prior conclusions.  See 85 Fed. Reg. at 64,631.  On every point, the agency's analysis failed to offer a rational basis for its attempted reversal.

The Service first arbitrarily extrapolated from several distinguishable wolverine observational studies to claim that lower-48 wolverine habitat is not confined to snowy "'habitat islands'" scattered among broader expanses of unsuitable habitat.  Id.  In this regard, the Service relied on certain accounts of wolverines denning outside the geographic limits of a spring snow-cover model for wolverine habitat—a model that was developed in a scientific study by Copeland, et al. (2010).  See 85 Fed. Reg. at 64,631; see also Defs. of Wildlife, 176 F. Supp. 3d at 982-85, 1003-05 (discussing Copeland, et al. (2010) study and rejecting the Service's 2014 attempt to discredit Copeland's conclusions).  However, the Service ignored the critical fact that the denning observations it relied upon involved wolverines occupying disparate boreal forest habitats at more northerly latitudes where the wolverine's colder habitat niche may not be as closely defined by snowy landscapes.  See 85 Fed. Reg. at 64,631 (citing Canadian and Scandinavian observations).  In fact, the only published, peer-reviewed analysis

among the Service's cited sources—Webb, et al. (2016)—itself noted a distinction between wolverine locations in such northerly boreal forest habitats as compared to those in Rocky Mountain environments within its Alberta study area, reporting that the Rocky Mountain wolverines "were located in townships with high amounts of spring snow cover," whereas those in boreal forest habitats appeared to be less associated with snowy spring conditions.  FWS0044404.  Accordingly, the Webb study advised that "it may be important to view the Rocky Mountains and Boreal Forest data separately when drawing conclusions." Id.  Further, Webb, et al. (2016) suggested that its boreal forest observations reflect particular wolverine associations with habitat conditions that are unique to that environment: "In northern Alberta, where the dry but cold climate limits snow, temperature may play a more important role in characterizing the distribution of wolverines and restricting the wolverine's niche to cooler environments where wolverines have the competitive edge."  FWS0044405.  The Service arbitrarily ignored all such admonitions despite relying on the Webb, et al. (2016) study.  See Defs. of Wildlife v. Babbitt, 958 F. Supp. 670, 685 (D.D.C. 1997) ("Although the Court must defer to an agency's expertise, it must do so only to the extent that the agency utilizes, rather than ignores, the analysis of its experts.").

The Service equally ignored its own prior recognition of the key distinction between such boreal and mountainous wolverine habitats.  The Service's first

24

attempt to withdraw its proposed wolverine listing rule in 2014 concluded that the discovery of wolverine dens "in flat or lowland boreal forest area"—like those cited in the Withdrawal—would be "largely irrelevant" to any listing decision for the lower-48 wolverine population "because the habitats in the contiguous U.S. [] are not lowland boreal habitats but rather mountainous habitats where the [Copeland, et al. (2010)] model fit is very good."  79 Fed. Reg. at 47,527.  The Service made no attempt to reconcile this finding with its new conclusion in the Withdrawal that dismissed "the distribution of persistent spring snow cover in mountainous regions" as a key habitat feature for wolverines based on such disparate boreal observations.  85 Fed. Reg. at 64,631; see Organized Vill. of Kake, 795 F.3d at 966 (agency reversing policy must provide reasoned explanation for disregarding prior factual findings).  Nor did the Service examine the recent findings of Mowat, et al. (2019), which reaffirmed "that spring snow is related to [wolverine] density in montane environments, which suggests a functional relationship with wolverine ecology."  FWS0048781 (emphasis added).  Further, despite its ultimate conclusion, the Service's Withdrawal analysis lacked citation to a single scientific study documenting wolverine denning outside areas characterized by deep, persistent spring snow in the mountainous environments where wolverine habitat in the lower-48 states is concentrated.  See 85 Fed. Reg. at 64,631.

The Service also sought to dismiss the importance of snow as a critical wolverine habitat feature in the lower-48 states by pointing to additional factors, such as "availability of prey and avoidance of predators," that wolverines use to select habitat. Id.  While these factors may well be important, the cited evidence does not diminish the significance of the mountainous landscape defined by deep, persistent spring snow cover as an essential feature of wolverine habitat in the lower 48.  To the contrary, one of the studies cited by the Service for its conclusion, Inman, et al. (2012), explicitly agreed with Copeland, et al. (2010) that "occupying cold, snow-covered, and relatively unproductive environments is a common pattern throughout the global distribution of the species," FWS0030715, while the other, Scrafford, et al. (2017), assessed wolverines' response to habitat disturbances and did not address the species' climatic habitat requirements, FWS0038719.  Accordingly, neither supports the Service's attempt to reverse its prior findings about the conservation threat arising from the fragmented nature of the wolverine's snowy habitat in the lower-48 states.[7]

For all these reasons, the Service acted irrationally in reversing its prior findings that differences in the wolverine's conservation status across the U.S.-Canada border satisfied the discreteness requirement for a segment designation.

---

[7] Indeed, the principal author of Inman, et al. (2013) developed his own estimate of wolverine habitat in the lower-48 states, which "matched well" with Copeland, et al. (2010), "concurring cross >96% of the western US."  FWS0030730.

Contrary to the Service's Withdrawal—but as the Service itself previously determined and twice reaffirmed—the lower-48 wolverine population's small total and effective populations and more fragmented habitat constitute stark differences from Canadian populations that threaten potential extirpation of this population absent additional regulatory protections for the lower-48 wolverines.  See 75 Fed. Reg. at 78,040.  Accordingly, these differences justify a discreteness finding, and the Service violated the ESA in reversing its prior conclusions on this issue.

2.     The Service Also Arbitrarily Determined That the Lower-48 Wolverine Population is Not Markedly Separate from the Canadian Population

In addition to irrationally reversing its prior conclusion regarding differences in conservation status, the Service arbitrarily rejected a finding that the lower-48 wolverine population may be deemed discrete because of its marked separation from more northerly populations.  Under the Service's segment policy, a wildlife population may independently qualify as "discrete" if it is "markedly separated from other populations of the same taxon."  61 Fed. Reg. at 4,725.  Further, "[q]uantitative measures of genetic … discontinuity may provide evidence of this separation."  Id.  In its Withdrawal, the Service summarily disposed of this issue by simply asserting that wolverines in the lower-48 states are not "genetically isolated from wolverines in Canada," and therefore "wolverines in the contiguous United

27

States are not discrete based on marked separation from other populations of the same taxon." 85 Fed. Reg. at 64,628.[8]

The Service's conclusion on this issue arbitrarily failed entirely "to consider an important aspect of the problem" it was addressing.  Or. Nat. Res. Council, 476 F.3d at 1036 (quotations and citation omitted).  Although the Service relied on a finding that lower-48 wolverines are not "genetically isolated from wolverines in Canada," 85 Fed. Reg. at 64,628, the agency's segment policy does not require such isolation for discreteness based on marked separation.  Rather, the policy explicitly provides that quantitative measures of genetic "discontinuity"—not isolation—may suffice.  61 Fed. Reg. at 4,725.  Further, the Service's accompanying preamble commentary explained that "absolute reproductive isolation" is not "a prerequisite to recognizing" a segment because that "would be an impracticably stringent standard, and one that would not be satisfied even by some recognized species that are known to sustain a low frequency of interbreeding with related species."  Id. at 4,724; see id. at 4,724 ("[T]he standard adopted [for discreteness] does not require absolute separation of a DPS from other

---

[8] The Service's 2010 segment determination did not address the independent marked-separation basis for a discreteness finding. 75 Fed. Reg. at 78,036-40. Nevertheless, in addressing the significance prong of the segment standard, the Service in 2010 recognized marked genetic differences between the lower-48 and Canadian populations, although it ultimately did not rest its significance determination on this basis.  Id. at 78,041-42.

members of its species, because this can rarely be demonstrated in nature for any

population of organisms."); see also Nat'l Ass'n of Home Builders, 340 F.3d at

842 (recognizing that the "[discreteness] standard distinguishes a population from

other members of its species, but does not require 'absolute separation'") (citation

omitted).  Accordingly, by insisting on genetic isolation rather than genetic

discontinuity as a basis for a discreteness finding under the marked-separation

standard, the Service arbitrarily ignored its own segment policy.  See Nw. Env't

Def. Ctr. v. Bonneville Power Admin., 477 F.3d 668, 687–88 (9th Cir. 2007)

("[A]n agency changing its course must supply a reasoned analysis indicating that

prior policies and standards are being deliberately changed, not casually ignored,

and if an agency glosses over or swerves from prior precedents without discussion

it may cross the line from the tolerably terse to the intolerably mute.") (citation

omitted).

If the Service had examined the best available scientific evidence regarding

the lower-48 wolverine population's genetic discontinuity—rather than isolation—

from Canadian wolverines, it would have found much on which to base a finding

of marked separation.  As discussed supra, this includes evidence that the lower-48

wolverine population contains only 3 of the 13 haplotypes documented in the

Canadian population, which the Service in 2010 determined to indicate that

individuals are not passing freely between Canadian and U.S. populations, 75 Fed.

Reg. at 78,041, as well as the Sawaya, et al. (2019) study documenting the barrier to wolverine movement posed by the Trans-Canada Highway and the Mowat, et al. (2019) and Kukka, et al. (2017) studies indicating that unsustainable Canadian trapping presents a significant obstacle to wolverine dispersal and movement across the U.S.-Canada border.  See FWS0049082-91; FWS0048770-83; FWS0033542-49; see also PI-001245 (2013 peer-review comment by Forest Service geneticist stating that lower-48 wolverine population may be deemed discrete "due to the fact that it is markedly separated from other populations").

By failing entirely to consider such evidence that was directly relevant to its standard of genetic discontinuity for a discreteness finding, and instead insisting on evidence of genetic isolation that was not required by its own segment policy, see 61 Fed. Reg. at 4,724-25, the Service again acted arbitrarily in violation of the ESA.  Or. Nat. Res. Council, 476 F.3d at 1036; 16 U.S.C. § 1533(b)(1)(A) (best-available-science requirement).  For this reason too, the Service erroneously deemed the lower-48 wolverine population not to qualify as a segment for ESA listing purposes.[9]

---

[9] Because the Service determined that the lower-48 wolverine population is not discrete from the Canadian population, the agency did not complete a significance analysis under the segment policy.  85 Fed. Reg. at 64,631.  Nevertheless, for the same reasons the Service found the lower-48 wolverine population significant in its 2010 segment determination, the population remains significant today.  See 75 Fed. Reg. at 78,040-42.

## II. THE SERVICE ARBITRARILY REJECTED THREATS TO THE WOLVERINE ESTABLISHED BY THE BEST AVAILABLE SCIENCE

Plaintiffs adopt and incorporate the arguments by WildEarth Guardians, et al. in case No. CV 20-183-M-DWM that the Service arbitrarily dismissed threats to the lower-48 wolverine population from climate change, small population size, low genetic diversity, and the cumulative effects of these and other threats, in violation of the ESA, 16 U.S.C. § 1533(a)(1), (b)(1)(A) (requiring evaluation of threats to species based on best available science).

## III. THE COURT SHOULD REMEDY THE SERVICE'S ESA VIOLATIONS BY VACATING AND REMANDING THE WITHDRAWAL DECISION WITH A 12-MONTH DEADLINE

To remedy the Service's ESA violations, this Court should vacate and remand the challenged Withdrawal. Further, given the Service's repeated violations of the ESA in addressing the wolverine listing over more than two decades, this Court should impose a 12-month remand deadline and require quarterly status reports to ensure timely action to remedy this most recent round of statutory violations.

First, the Court should vacate and remand the Withdrawal. Remand is the basic remedy for a federal agency's violation of governing law and "vacatur of an unlawful agency action normally accompanies a remand." All. for the Wild Rockies v. U.S. Forest Serv., 907 F.3d 1105, 1121 (9th Cir. 2018). Here, remand

with vacatur is especially warranted because the Withdrawal terminates the

wolverine's status as a species proposed for listing under the ESA and thereby

eliminates the statutory protection that this status would otherwise confer.  See 16

U.S.C. § 1536(a)(4) (requiring interagency consultation regarding action likely to

jeopardize "any species proposed to be listed under" ESA); see also Pollinator

Stewardship Council v. U.S. Env't Prot. Agency, 806 F.3d 520, 532 (9th Cir. 2015)

(vacating unlawful agency action where leaving the action "in place risks more

potential environmental harm than vacating it"); Defs. of Wildlife, 176 F. Supp. 3d

at 1011-12 (remanding and vacating 2014 withdrawal of proposed wolverine

listing).

Second, the Court should impose a 12-month remand deadline given the

Service's long history of ESA violations and associated delays in the 21-year

wolverine listing saga, and should require the Service to submit quarterly status

reports on its progress during the remand period.  This Court has authority to

impose such requirements where circumstances warrant.  See Nat'l Wildlife Fed'n

v. Nat'l Marine Fisheries Serv., 524 F.3d 917, 937 (9th Cir. 2008) (affirming

district court injunction that imposed remand deadline with reporting

requirements).  In particular, an agency's "history of … failures to comply with the

ESA" regarding a particular issue may provide "'substantial justification'" for

requiring a remand "process that is somewhat detailed and monitored by the

court." <u>Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.</u>, No. CV 01–640–RE, CV 05–23–RE, 2005 WL 2488447, at *4 (D. Or. Oct. 7, 2005), <u>aff'd</u>, 524 F.3d at 917; <u>see also</u> <u>Alaska Ctr. for the Env't v. Browner</u>, 20 F.3d 981, 986-87 (9th Cir. 1994) (affirming district court order requiring agency to submit report and propose schedule for corrective action to remedy decade-long failure to comply with Clean Water Act).

Here, the Service's history of failures is well known to this Court. Beginning with this Court's 2006 rejection of the Service's preliminary, 90-day finding on the wolverine listing petition, <u>see</u> <u>Defenders of Wildlife v. Kempthorne</u>, CV 05-99-M-DWM, slip. op. at 18-21 (D. Mont. 2006), the agency's unlawful efforts to resist a wolverine listing under the ESA have repeatedly required judicial correction—either through outright judicial reversals of Service decisions as occurred in 2006 and 2016, <u>see</u> <u>Defs. of Wildlife</u>, 176 F. Supp. 3d at 975, or through judicially approved settlements of challenges to agency actions that the Service did not even attempt to defend, <u>see</u> Statement of Facts ¶¶ 114-17, 143. This pattern of Service violations of the ESA has continued to the present, with the challenged Withdrawal recycling an unjustified tactic—deeming the lower-48 wolverine population an unlistable entity—that the Service refused even to defend when it was attempted before, and offering warmed-over versions of arguments dismissing threats to the wolverine—including climate change and small

population size—that this Court rejected in 2016.  See Defs. of Wildlife, 176 F.

Supp. 3d at 1001-06.  These circumstances alone warrant a remand deadline with a

regular reporting requirement.  See Nat'l Wildlife Fed'n, 2005 WL 2488447, at *4.

The record demonstrates even greater need for such relief.  This Court's

ruling that invalidated the Service's 2014 attempt to withdraw the wolverine-listing

proposal stated that, "if there is one thing required of the Service under the ESA, it

is to take action at the earliest possible, defensible point in time to protect against

the loss of biodiversity within our reach as a nation.  For the wolverine, that time is

now." Defs. of Wildlife, 176 F. Supp. 3d at 1011 (emphases added).  Yet despite

this Court's clear mandate for prompt action, the Service failed to conclude its

remand consideration of the proposed listing for more than four years after this

Court's 2016 judgment, and, even then, acted only after being prodded out of its

complacency by another lawsuit from Plaintiffs.  See Statement of Facts ¶¶ 142-43.

Moreover, the record demonstrates that the Service's relevant regional directors

recommended the agency's ultimate decision to once again reject a wolverine

listing under the ESA at a Service meeting in January 2018.  See FWS0055367

(Service summary of January 2018 meeting).  Yet the Service had taken no action

to formalize this regional leadership recommendation for more than two years after

this meeting when Plaintiffs returned to this Court in March 2020 to request a

judicial deadline for agency action.  Such prolonged agency delay in the face of

prior judicial urgings underscores the need for new corrective measures to ensure timely Service action to complete a wolverine listing process that this Court stated nearly five years ago must be concluded "at the earliest possible, defensible point in time."  Defs. of Wildlife, 176 F. Supp. 3d at 1011.

Further, a 12-month timeframe constitutes an appropriate deadline.  An order from this Court vacating the Service's Withdrawal would restore the regulatory status quo when the Withdrawal was promulgated.  See Sierra Club v. U.S. EPA, 850 F. Supp. 2d 300, 303 (D.D.C. 2012) ("When a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect … .") (internal quotations omitted); accord Am. Acad. of Pediatrics v. U.S. Food & Drug Admin., 330 F. Supp. 3d 657, 663-64 (D. Mass. 2018) (citing cases). Here, restoring the pre-Withdrawal status quo would place the Service in the position of facing a 12-month statutory deadline to act where the agency had already delayed for more than four years.  See 16 U.S.C. § 1533(b)(6)(A) (imposing one-year deadline for action on proposed listing rule).  Accordingly, a 12-month remand deadline is the maximum that should be allowed consistent with Congress's mandate and the agency's extensive record of delay.

## CONCLUSION

For the foregoing reasons, this Court should vacate and remand the challenged Withdrawal, and should require the Service to complete its remand

35

within 12 months of judgment and in the meantime to file quarterly reports to

update the Court and the parties on the progress of remand proceedings.

Respectfully submitted this 5th day of November, 2021.

/s/ Timothy J. Preso
Timothy J. Preso
Amanda D. Galvan
Earthjustice
P.O. Box 4743
Bozeman, MT 59722-4743
(406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org
agalvan@earthjustice.org

*Attorneys for Plaintiffs in Case No.
20-181*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(d)(2)(E), I hereby certify that this brief complies with Local Rule 7.1(d)(2)(E) because it contains 7,985 words, excluding caption, certificate of compliance, table of contents and authorities, exhibit index, and certificate of service.

/s/ Timothy J. Preso<br>
Timothy J. Preso

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing, together with all supporting documents, was today served via the Court's CM/ECF system on all counsel of record.

/s/ Timothy J. Preso<br>
Timothy J. Preso