Matthew K. Bishop (Mont. Bar No. 9968)
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
bishop@westernlaw.org

John R. Mellgren, *admitted pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Blvd., Ste. 340
Eugene, OR 97401
mellgren@westernlaw.org

*Counsel for Plaintiffs in member case CV-20-183*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | Lead Case No. CV-20-181-M-DWM |
| Plaintiffs, vs. | Member Case No. CV-20-183-M-DWM |
| MARTHA WILLIAMS, et al., | |
| Federal-Defendants, | RESPONSE IN OPPOSITION TO MOTION FOR REMAND WITHOUT VACATUR |
| and | |
| STATE OF IDAHO, | |
| Defendant-Intervenor. | |

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

BACKGROUND ................................................................................. 2

STANDARD OF REVIEW ....................................................................... 6

ARGUMENT ................................................................................. 9

A.      Remand with vacatur is the appropriate remedy .......................... 9

        1.   The Service's errors are serious ............................................. 10

        2.   There are no disruptive consequences ................................... 21

        3.   Interim protections for wolverine will be restored ................ 26

CONCLUSION .............................................................................. 33

CERTIFICATE OF COMPLIANCE ........................................................ 33

# TABLE OF AUTHORITIES

**FEDERAL CASES:**

*Alliance for the Wild Rockies v. Marten,*
   2018 WL 2943251 (D. Mont. 2018) .............................................*Passim*

*Alliance for the Wild Rockies v. Savage,*
   375 F. Supp. 3d 1152 (D. Mont. 2019) .................................................. 8

*Cal. Cmtys. Against Toxics v. EPA,*
   688 F. 3d 989 (9th Cir. 2012) ........................................... 7, 8, 9, 21, 22

*Ctr. for Biological Diversity v. Haaland,*
   998 F.3d 1061 (9th Cir. 2021) ............................................................ 17

*Ctr. for Native Ecosystems v. Salazar,*
   795 F. Supp. 2d 1236 (D. Colo. 2011) ................................................. 14

*Defs. of Wildlife v. Jewell,*
   176 F. Supp. 3d 975 (D. Mont. 2016) ........................................*Passim*

*Dep't of Homeland Security v. Regents of the Univ. of California*
   140 S. Ct. 1891 (2020) ................................................................... 15, 19

*Idaho Farm Bureau Fed'n v. Babbitt,*
   58 F. 3d 1392 (9th Cir. 1995) ............................................................. 21

*In re Clean Water Act Rulemaking,*
   2021 WL 4924844 (N.D. Cal. 2021) ..........................................*Passim*

*Keltner v. United States,*
   148 Fed. Cl. 552 (2020) ................................................................ 16, 20

*N. Coast Rivers All. v. Dep't of the Interior,*
   2016 WL 8673038 (E.D. Cal. 2016) .................................................... 14

*Nat. Res. Def. Council v. EPA,*
489 F. 3d 1364 (D.C. Cir. 2007) .......................................................... 21

*Nat. Res. Def. Council v. Norton,*
2007 WL 14283 (E.D. Cal. Jan. 3, 2007) ............................................ 20

*Nat'l Family Farm Coal. v. U.S. Envtl. Prot. Agency,*
960 F.3d 1120 (9th Cir. 2020) ............................................................. 9

*Native Ecosystems Council v. Marten,*
2020 WL 1479059 (D. Mont. 2020) .................................................... 27

*Navajo Nation v. Regan,*
2021 WL 4430466 (D. N.M. 2021) ................................... 12, 21, 22, 23

*Nw. Env't Advocs. v. U.S. Env't Prot. Agency,*
2018 WL 6524161 (D. Or. Dec. 12, 2018) ............................................ 9

*Org. Vill. of Kake v. U.S. Dep't of Agric.,*
795 F.3d 956 (9th Cir. 2015) ............................................................. 18

*Pascua Yaqui Tribe v. U.S. Envtl. Prot. Agency,*
2021 WL 3855977 (D. Ariz. 2021).............................. 12, 14, 22, 25, 26

*Pollinator Stewardship Council v. U.S. E.P.A.,*
806 F.3d 520 (9th Cir. 2015)........................................ 8, 15, 16, 21, 22

*Rock Creek Alliance v. U.S. Fish & Wildlife Serv.,*
No. CV 01-152-M-DWM (D. Mont. Mar. 19, 2002)....................... 20, 21

*SKF USA Inc. v. United States,*
254 F.3d 1022 (Fed. Cir. 2001) ............................................................ 7

*Swan View Coal. v. Weber,*
783 F. App'x 675 (9th Cir. 2019)........................................................ 27

*Western Oil & Gas Ass'n v. EPA,*
633 F.2d 803 (9th Cir. 1980).............................................................. 22

iii

STATE CASES:

*Helena Hunters and Anglers Associate v. Maurie*r,
    Case BDV-2012-868 (1st Judicial District Montana) ........................ 32

FEDERAL STATUTES:

5 U.S.C. § 706(2) ................................................................................ 3, 6, 8

16 U.S.C. § 1536(a)(4) ....................................................................... 23, 26

16 U.S.C. § 1536(c) ............................................................................ 25, 27

STATE STATUTES:

MCA §§ 87-1-201(9)(a)(i), (ii) ................................................................. 32

FEDERAL REGULATIONS:

36 C.F.R. § 219.9(b)(1) ............................................................................ 30

36 C.F.R. § 219.9(b)(1)(a) ................................................................. 27, 28

50 C.F.R. § 402.02 ................................................................................... 26

FEDERAL REGISTER:

61 Fed. Reg. 4,722 (February 7, 1996) .................................................... 18

78 Fed. Reg. 7,864 (February 4, 2013) .................................................... 27

85 Fed. Reg. 64,618 (October 13, 2020) .................................................... 4

Federal-Defendants (the Service) seek a voluntary remand in this case in lieu briefing summary judgment. As such, the Service has chosen not to defend the October 2020 withdrawal of its proposed rule to list wolverine as a threatened species under the Endangered Species Act (ESA). Instead, the Service wants to re-evaluate its withdrawal after having reviewed WildEarth Guardians' (Guardians') opening brief on summary judgment with the goal of "substantiating" the decision over the course of the next 18-months. And during this remand period, the Service is asking that the underlying decision being challenged in this case (the withdrawal) remain in effect. In other words, the Service wants to avoid potential liability in this case – thus depriving Guardians of its day in court – while simultaneously leaving the challenged decision intact.

This Court should reject this request. The Service should not be allowed to have it both ways, i.e., be given the opportunity to re-work its decision while leaving it on the books. Guardians does not object to the Service's request for voluntary remand or even the proposed 18-month timeframe for issuing a new decision, but the law and facts require the underlying decision be vacated during the remand period.

1

# BACKGROUND

This case challenges the Service's October 2020 withdrawal of its 2013 proposed rule to list wolverine as a threatened distinct population segment in the contiguous United States under the ESA.

This is the second time Guardians has challenged the Service's withdrawal of this proposed listing rule. Previously, in *Defs. of Wildlife v. Jewell,* 176 F. Supp. 3d 975, 980 (D. Mont. 2016), Guardians successfully challenged the Service's 2014 withdrawal of the same proposed listing rule. In that case, the court held that the Service erred in its assessment of the climate change threat to wolverine and in its finding that small population size and low genetic diversity in the contiguous United States did not pose threat to the species. *Id.* at 1101. The court also ordered the Service to revisit its analysis of whether wolverine qualify for listing throughout a significant portion of their range in the contiguous United States. *Id.* at 1007.

Central to the court's holding in *Defs. of Wildlife* was the Service's misinterpretation of the best available wolverine science and its arbitrary insistence on certainty when it came to evaluating and understanding climate change (and other) threats to the species and

how wolverine would respond to them. As explained in *Defs. of Wildlife*, such certainty – especially for a hard-to-study and illusive snow-dependent species like wolverine – is not required under the ESA. *Id.* at 1005, 1011. "No greater level of certainty is needed to see the writing on the wall for this snow-dependent species standing squarely in the path of global climate change. It has taken twenty years to get to this point . . . if there is one thing required of the Service under the ESA, it is to take action at the earliest possible, defensible point in time to protect against the loss of biodiversity within our reach as a nation. For the wolverine, that time is now." *Id.* at 1011.

Ultimately, in *Defs. of Wildlife*, the court remanded the matter to the Service to re-evaluate its determination that climate change and small population size and low genetic diversity do not pose a threat to wolverine and re-visit its application of its "significant portion of its range" policy. *Id.* Consistent with the Administrative Procedures Act (APA), 5 U.S.C. § 706(2), the court also vacated the Service's 2014 withdrawal, thereby reinstating the 2013 proposed listing rule and the wolverine's interim status as a species proposed for listing under the ESA. *Id.*

3

Following the remand order in *Defs. of Wildlife*, the Service issued

a new decision in October 2020, choosing to again withdraw its

proposed listing rule for wolverine. 85 Fed. Reg. 64,618 (October 13,

2020). In so doing, the Service provided much of the same rationale as

before, noting that the threats to wolverine are not as significant as

previously believed in the proposed listing rule. *Id.*

In this case, Guardians maintains this second withdrawal is also

arbitrary, capricious, and not in accordance with the ESA for a number

of reasons, all of which are supported by the administrative record,

Guardians' statement of undisputed facts (Doc. 40), and detailed in

Guardians' opening brief (Doc. 37).

Guardians' brief explains that no new climate change science since

the *Defs. of Wildlife* decision supports the Service's second withdrawal.

*See* Doc. 37 at 14-28.[1] The same is true for the threat from small

population size and low genetic diversity. The best available science

remains unchanged and reveals the estimated population of 250-300

wolverines in the contiguous United States (with an effective population

---

[1] Citations are to the ECF page number.

4

of only 35) is well below the number needed for long-term viability and, when working in concert with climate change and other secondary stressors, poses a threat to the species. *Id.* at 28-40.

Guardians' brief also explained why the Service's "foreseeable future" timeframe for evaluating future threats to wolverine in the withdrawal was arbitrary (too short) and in conflict with the best available climate models *See* Doc. 37 at 40-47. In addition, Guardians explained why the agency arbitrarily neglected to re-evaluate whether wolverine are threatened in a significant portion of their range as directed by the court in *Defs. of Wildlife*. *Id.* at 48-50. Again, all of these arguments were detailed in Guardians' brief (Doc. 37) and supported by Guardians' statement of undisputed facts (Doc. 40).[2]

In response, the Service chose not defend its actions on summary judgment. The Service chose not to file a response in opposition to Guardians' motion and not defend its withdrawal or otherwise argue and maintain wolverine do not qualify as a threatened species in the

---

[2] In accordance with this Court's previous order (Doc. 16), Guardians also coordinated with the Plaintiffs in the lead case, Case No. 20-181, and adopted their arguments on the Service's distinction population segment determination by reference. *See* Doc. 37 at 14 n.2.

United States. Nor does the agency deny any of Guardians' legal claims regarding climate change threats, the threat from small population size and low genetic diversity, or cumulative threats. The Service also does not defend or explain why its short, compressed timeframe for evaluating future threats or significant portion of its range analysis comport with the ESA.

Instead, the Service boldly asks this Court to deny Guardians' motion for summary judgment and grant its request for a redo – a voluntary remand – without any legal ramifications or recourse. The Service wants a voluntary remand and 18 months to re-evaluate Guardians' arguments and then "substantiate" its decision to avoid legal liability while simultaneously leaving its underlying decision to withdraw the proposed listing rule for wolverine on the books. Guardians opposes this request.

## STANDARD OF REVIEW

Under the APA, courts review challenged agency action to determine whether it is arbitrary and capricious or otherwise not in accordance with law. 5 U.S.C. § 706(2). In response to such challenges, an agency typically takes one of five positions: "(i) it may defend the

6

decision on previously articulated grounds; (ii) it may seek to defend the decision on grounds not previously articulated by the agency; (iii) it may seek remand to reconsider its decision because of intervening events outside the agency's control; (iv) it may seek remand even absent any intervening events, without confessing error, to reconsider its previous position; and (v) it may seek remand because it believes the original decision was incorrect on the merits and it wishes to change the result." *In re Clean Water Act Rulemaking*, 2021 WL 4924844, *4 (N.D. Cal. 2021) (citing *SKF USA Inc. v. United States*, 254 F.3d 1022, 2027-1028 (Fed. Cir. 2001)); *see also Cal. Cmtys. Against Toxics v. EPA*, 688 F. 3d 989, 992 (9th Cir. 2012) (approving *SKF USA* taxonomy); *Alliance for the Wild Rockies v. Marten*, 2018 WL 2943251, *2 (D. Mont. 2018) (same). An agency, therefore, is not compelled to defend a challenged action in a district court and may instead "voluntarily request the court to remand the action to the agency for further proceedings." *Id*.

Generally, courts only refuse voluntary requests for remand "when the agency's request is frivolous or made in bad faith." *Cal. Cmtys. Against Toxics,* 688 F. 3d at 992. Such remands, however, typically occur with vacatur of the underlying decision or rule being

7

challenged – this is the default standard and presumptive remedy under the APA. *In re Clean Water Act*, 2021 WL 4924844, at *5; *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015); *see also* 5 U.S.C. § 706(2) (directing that courts to "set aside" arbitrary agency actions).

For this reason, requests for remand without vacatur are only granted in "rare circumstances." *Id.* at 532 (citing *Cal. Cmties. Against Toxics*, 688 F.3d at 994); *see also Marten*, 2018 WL 2943251, *2 (same). It is only in the limited circumstances – when equity demands – that "the agency action is left in place on remand." *Marten*, 2018 WL 2943251, *2 (citations omitted). The decision whether to vacate the underlying decision or rule on remand is controlled by principles of equity. *Alliance for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1155 (D. Mont. 2019) (citation and quotation omitted). Sometimes, in very limited circumstances, equity demands an underlying decision or rule be left in place during the remand period. *See Cal. Cmtys. Against Toxics,* 688 F. 3d at 992 (discussing circumstances). The Service bears the burden of demonstrating remand without vacatur is appropriate.

*Nw. Env't Advocs. v. U.S. Env't Prot. Agency*, 2018 WL 6524161, at *3 (D. Or. Dec. 12, 2018).

## ARGUMENT

As previously noted, Guardians does not oppose the Service's request for voluntary remand. Nor does Guardians oppose the Service's proposed 18-month timeframe. Guardians objects, however, to the Service's request for remand in this case without vacatur of its withdrawal decision and requests this Court order remand with vacatur.

## A.    Remand with vacatur is the appropriate remedy.

When evaluating requests for remand without vacatur, courts evaluate the seriousness of the agency's errors and the disruptive consequences that would result from vacatur. *Cal. Cmtys. Against Toxics*, 688 F.3d at 992. Courts also consider "the extent to which either vacating or leaving the decision in place would risk environmental harm." *Nat'l Family Farm Coal. v. U.S. Envtl. Prot. Agency*, 960 F.3d 1120, 1144-45 (9th Cir. 2020). These factors all weigh in favor of a remand with vacatur in this case.

## 1.    The Service's errors are serious.

First, the Service's withdrawal includes a number of serious errors that have denied and continue to deny wolverine protective status under the ESA.

For example, in terms of climate change threats, the Service's withdrawal arbitrarily asserted that new information called into question its earlier findings, including its reliance on Copeland (2010)'s spring snow model and McKelvey (2011)'s use of this model to evaluate climate change threats to wolverine. Doc. 37 at 17. Based on Webb (2016), Ray (2017), and other papers, the Service claimed wolverine were more adaptable and less reliant on spring snow for denning than previously assumed and insisted that even if spring snow is necessary for wolverine, sufficient snowpack in areas occupied by the species will remain in the contiguous United States. *Id.* at 17-18. Yet review of Webb (2016), Ray (2017), and the other papers relied on by the agency revealed the new studies were entirely consistent with the Service's previous climate change findings and the scientific literature it relied on. *See id.* at 18-28.

The same is true with respect to the threat from small population size and low genetic diversity. *See* Doc. 37 at 28-38. The scientific studies relied on in the proposed listing rule remain valid and more recent genetic studies, including Pilgrim and Schwartz (2018), merely confirm what the Service already new from the older genetic studies, including Schwartz (2009), Cegelski (2006), and McKelvey (2014), i.e., that population numbers are too small for long-term viability and wolverine are already experiencing extremely low levels of genetic diversity. *Id.* at 31-32. In the withdrawal, the Service also insisted that new information revealed there was sufficient connectivity between wolverine in Canada and those in the contiguous United States to address genetic concerns but the best available science actually revealed just the opposite: there is likely a genetic break between the two populations that is preventing the necessary genetic exchange. *Id.* at 32.

The Service's withdrawal also departs from the agency's previous determination that future threats to wolverine from climate change needed to be evaluated out to the end of this century in order to be consistent with the best available science, including the

11

Intergovernmental Panel on Climate Change's (IPCC's) climate models. *See* Doc. 37 at 41-32. But instead of applying this timeframe, the Service arbitrarily defined the "foreseeable future" only out to 2055 which had the effect of underestimating the climate change threat. *Id.* at 42-47. Further, despite the court's directive in *Defs. of Wildlife* to evaluate whether wolverine qualify for listing in a "significant portion of its range" in the contiguous United States, 176 F. Supp. 3d at 1007, no such evaluation was ever undertaken by the agency. *See* Doc. 37 at 48-50. This was a major oversight, and adds to the arbitrary nature of the Service's withdrawal.

These are just some of the serious errors. These errors are not "mere procedural errors or problems that could be remedied through further explanation." *Navajo Nation v. Regan*, 2021 WL 4430466, at *3 (D. N.M. 2021) (quoting *Pascua Yaqui Tribe v. U.S. Environmental Protection Agency*, 2021 WL 3855977, at *5 (D. Ariz. 2021)). Rather, they involve substantive flaws in the Service's threats assessment, flaws that cannot be easily re-evaluated, cured, or substantiated with a simple revised explanation. *See id.* (citations omitted). Indeed, this is why the court previously ordered remand with vacatur in *Defs. of*

*Wildlife*, 176 F. Supp. 3d at 1011. The Service's 2014 withdrawal

needed to be vacated because it included an arbitrary threats

assessment that conflicted with the best available science and violated

the ESA. *Id.*

Notably, the Service's motion for voluntary remand fails to

address the serious errors of the withdrawal. The Service concedes it

needs to "re-examine" and "re-evaluate" the withdrawal (Doc. 44 at 17)

and admits it failed to consider two important and relevant studies. *See*

Doc. 44 at 19. The Service also chose not to defend its decision on

summary judgment which means under Local Rule 56.1(d) the agency

has effectively admitted Guardians' statement of material facts (Doc.

40) and forfeited its ability to put forth a legal defense of the

withdrawal. But aside from this, the Service never directly addresses

the seriousness of its errors.

Presumably, this is because the Service is seeking a voluntary

remand before a ruling on the merits. In the Ninth Circuit, however, it

does not matter: Courts apply the same equitable factors or "ordinary

test" for whether remand should include vacatur even when the agency

requests a voluntary remand and even though no determination on the

13

merits is made. *See In re Clean Water Act Rulemaking*, 2021 WL 4924844, at *4-5, 6 (citing cases). A number of district courts in the Ninth Circuit – including this district court – have "consistently acknowledged they have the authority to vacate agency actions upon remand prior to a final determination of the action's legality." *Id*. at *4 (citing and discussing *Pascua Yaqui Tribe*, 2021 WL 3855977, at *4; *Marten*, 2018 WL 2943251, at *2-3; *Ctr. for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1241-42 (D. Colo. 2011); *N. Coast Rivers All. v. Dep't of the Interior*, 2016 WL 8673038, at *6 (E.D. Cal. 2016)).

In *Marten*, for example, the Forest Service sought a remand without confessing any errors attributable to the agency. 2018 WL 2943251 at *1. The court granted this remand request but did so with vacatur of the underlying decision because the error being addressed in that case – the need to re-evaluate the effects of a fire on the landscape – was significant and will likely result in a change to the final decision. *Id*. at *3. The same is true here: The remand sought by the Service in this case is to address serious errors in the withdrawal – errors that do not lend themselves to a simple, procedural fix and errors that cannot easily be cured or substantiated with a new explanation.

14

The Service argues otherwise, maintaining there is a "'serious possibility' that the Service may be able to justify" its decision following the 18-month remand. Doc. 44 at 23 (citing *Pollinator Stewardship Council*, 806 F. 3d at 532). The Service insists it may still be able to "rationally explain" its decision and "still lawfully" find that the withdrawal was appropriate. *Id*. But this is merely a request to provide a new rationale for a decision that was already made – a post hoc rationalization – which is inappropriate under the APA. *Dep't of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1909 (2020).

Under the APA, courts are tasked with only considering "contemporaneous explanations for agency action" which instills confidence that the reasons given are not merely "convenient litigation positons" and avoids the need for litigants and the courts to "chase a moving target." *Id*. (citations omitted). "The basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted" and cannot cut corners and rely on reasons that are absent from its original decision. *Id*. at 1909-1910. There is thus no need or legal authority for remanding a matter without vacatur to simply

substantiate a decision that was already made. *See, e.g., Keltner v. United States*, 148 Fed. Cl. 552, 566 (2020) (rejecting request for voluntary remand when the agency's goal is to simply write a "better decision for a predetermined outcome.").

The Service's request for an 18-month remand in this case also speaks for itself. If a simple justification or substantiation or new post hoc rationalization is all that is required, then arguably the Service would not need a voluntary remand at all or, at the very least, would not need 18-months to do it.

The Service's reliance on *Pollinator Stewardship Council,* 806 F. 3d at 532, is also misplaced. In that case, the Ninth Circuit actually vacated the underlying decision (EPA's registration of an insecticide) on remand in light of potential impacts to bee populations and the possibility that the agency would issue a different decision after reviewing additional studies. 806 F. 3d at 532. In *Pollinator Stewardship Council,* possible environmental harm and the need to review of additional scientific studies – much like the situation here – warranted remand with vacatur. *See id.*

16

Here, the Service insists it needs to re-examine portions of its withdrawal in light of the Ninth Circuit's decision in *Center for Biological Diversity v. Haaland*, 998 F.3d 1061 (9th Cir. 2021). Doc. 44 at 17. Presumably, the Service means how it defined the "foreseeable future" for evaluating future threats for wolverine and its failure to explain why it arbitrarily shortened the timeframe from the end of this century to only 38-50 years. *See* Doc. 37 at 40-47. *Center for Biological Diversity*, however, does not trigger the need for a remand.

As revealed by the Service's guidance in the 2009 Opinion (Doc. 37-5) and the Ninth Circuit's decision in *Center for Biological Diversity*, defining "foreseeable future" for evaluating future threats is highly species-specific. The Service examines the best available science on population and threat trends for each species to determine whether reliable, future predictions can be made and, if so, for how long. Doc. 37 at 40. As such, studies on population and threat trends for the Pacific walruses and how "foreseeable future" is defined in *Center for Biological Diversity* does not necessarily translate to wolverine. The importance and relevance of the Ninth Circuit's holding *Center for Biological Diversity*, however, is that changes in an agency's position must be

17

sufficiently and rationally explained. *See Org. Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015). This is something the Service failed to do here. But this holding is nothing new and certainly does not post-date the Service's withdrawal or justify a re-evaluation of it.

The Service also insists that "new scientific information," including studies raised in our briefing and the Service's Distinct Population Segment policy also warrant re-evaluation. But there is nothing new about this information either. The Service adopted the Distinct Population Segment policy in 1996, 61 Fed. Reg. 4,722 (February 7, 1996), and the two studies the agency failed to consider but would now like to "thoroughly examine" – Mowat (2019) and Sawaya (2019) – both predate the Service's October, 2020 withdrawal. The two papers were never discussed or evaluated in the withdrawal itself (which is a major oversight that undermines the agency's entire threats assessment, *see* Doc. 40 at ¶¶98-103, Doc. 37 at 35-36, 38) but they are both included in the administrative record. *See* FWS-0048770 (Mowat (2019)); FWS-0013021 (email about Mowat (2019)); FWS-0049082 (Sawaya (2019)).

In sum, the Service's errors in this case, i.e., the arbitrary threats analysis, failure to utilize the best available science, and compressed timeframe for evaluating future threats, are entirely attributable to the agency itself. *See Marten*, 2018 WL 2943251 at *3 (evaluating whether errors were attributable to the agency itself). As such, the Service's request for voluntary remand without vacatur in this case is nothing more than a request for a second bite at the apple – a request to correct mistakes it already made and do so without intervention from the court. This is inappropriate under the APA, *Dep't of Homeland Security*, 140 S. Ct. at 1909-1910, and would effectively deny Guardians the opportunity to vindicate their claims in federal court and while leaving them subject to an arbitrary decision that has and will continue harm their interests in wolverine. *See In Re Clean Water Act*, 2021 WL 4924844 at *4 (noting same).

Ultimately, the end result of the Service's legal maneuvering is yet more, continued delay in affording wolverine much needed ESA protections. Indeed, the Service is now asking to make a new decision on the wolverine's status at the end of 2023 – a decade after the proposed rule to list was published. In such circumstances, a remand

would not "further the interests of justice" but simply delay this case

further for the sole purpose of giving the government the opportunity to

"bolster" its case. *Keltner*, 148 Fed. Cl. at 564-565. This in

inappropriate. The "government could always seek a voluntary remand

following a fully briefed motion for judgment on the administrative

record and oral argument, thereby seeking to avoid a loss on the merits

. . . courts would then be bound to grant those motions, perhaps

repeatedly — and without regard to the interests of finality — until the

agency had carefully crafted its decision to avoid a party's legal

arguments . . ." *Id.* at 566. Such a "proffered justification for remand is

[thus] no justification at all." *Id.* at 565.

As this Court explained in *Rock Creek Alliance v. U.S. Fish &

Wildlife Serv.*, the Service cannot have it both ways, i.e., refuse to

defend its arbitrary decision and avoid legal liability for its

shortcomings while simultaneously seeking to have this decision remain

in effect during the remand period. No. CV 01-152-M-DWM, Order at 2

(D. Mont. Mar. 19, 2002); *see also Nat. Res. Def. Council v. Norton*, 2007

WL 14283, at *12 (E.D. Cal. Jan. 3, 2007) (noting same). The Service

cannot proceed "on both fronts simultaneously." *Rock Creek Alliance*,

20

No. CV 01-152-M-DWM, Order at 2. The Service must either defend the alleged errors in its decision or vacate it. *Id*. at 3.

## 2. There are no disruptive consequences.

Second, there are no disruptive consequences that would result from remand with vacatur in this case. Vacatur is generally considered "'disruptive' if 'it sets back achievement of the environmental protection required' by statute." *Navajo Nation*, 2021 WL 4430466 at *4 (citing *Nat. Res. Def. Council v. EPA*, 489 F. 3d 1364, 1374 (D.C. Cir. 2007)). Disruptive consequences are also usually measured by whether and to what extent the faulty decision or rule – if vacated – could result in possible environmental harm. *See, e.g., In Re Clean Water Act*, 2021 WL 4924844 at *9 (evaluating harm to water); *Pollinator Stewardship Council,* 806 F. 3d at 532-533 (harm to bees); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F. 3d 1392, 1405 (9th Cir. 1995) (harm to snails); *Cal. Cmtys. Against Toxics*, 688 F. 3d at 992 (harm to air).

In *Idaho Farm Bureau Fed'n*, for example, the Ninth Circuit chose not to vacate the agency's rule on remand because doing so could have wiped out a small snail species. 58 F. 3d at 1405. In *Cal. Cmtys. Against Toxics*, 688 F.3d at 994, the Ninth Circuit declined to vacate the agency

decision to avoid severe "calamities," including regional power outages, halting a billion-dollar venture employing 350 individuals, and new and needless legislative fixes. *Id*. In another case, the Ninth Circuit also ordered remand without vacatur to avoid thwarting the operation of the Clean Air Act in California. *Western Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980). These circumstances, however, are the exception, not the rule. *In re Clean Water Act*, 2021 WL 4924844, at *5. They also reveal "the level of severity of consequences" which typically warrant the rare remedy of remand without vacatur. *Marten*, 2018 WL 2943251 at *3.

Here, there are no disruptive consequences that would flow from remand with vacatur. There are no "exceptional circumstances where 'equity demands' that the Court exercise judicial restraint by declining to vacate [the underlying decision] upon remand" exist. *Marten*, 2018 WL 2943251 at *4. In fact, just the opposite is true.

Just like the earlier wolverine case, *Defs. of Wildlife*, and much like the situation at issue in *Navajo Nation, In re Clean Water Act, Pascua Yaqui Tribe*, and *Pollinator Stewardship Council,* vacatur in this case would actually further (rather than set back) the goals of the

statute – here, the ESA – by restoring interim protections for wolverine during the 18-month remand period. *See infra* section A.3. In these types of circumstances, the Ninth Circuit routinely vacates the underlying agency action. *See In Re Clean Water Act*, 2021 WL 4924844 at *9 (citing examples). When vacating the underlying decision has the "effect of preventing, rather than causing environmental harm, it follows that the 'interim change' caused by vacatur will not have 'disruptive consequences.'" *Navajo Nation*, 2021 WL 4430466 at *4 (citation omitted).

The Service nonetheless insists that remand with vacatur could be disruptive because wolverine would once again be considered proposed for listing which, in turn, would make the species eligible for conferencing under section 7(a)(4) of the ESA, 16 U.S.C. § 1536(a)(4), and in some circumstances require an evaluation in a biological assessment. Doc. 44 at 24. According to the Service, this would "cause confusion" and "create[] uncertainty" amongst the agencies, stakeholders, and the public. *Id.* In other words, according to the Service, having to comply with section 7 of the ESA and conference on wolverine for on-going and future projects during the 18-month remand

period is the "disruptive consequence" driving the Service's request for remand without vacatur. This argument deserves little attention from this Court.

For starters, no details or examples about why or how compliance with section 7 of the ESA's conferencing requirements would be disruptive are provided. Nor does the Service explain why having to merely comply with the law would be a "disruptive" or a severe consequence warranting remand without vacatur. Such details and examples are also missing from the Service's supporting declaration (Doc. 44-1 at 5).

Further, the notion that mere compliance with section 7 of the ESA for on-going and future actions is a disruptive consequence is devoid of any legal or factual support. Compliance with the law is unlike any of the disruptive consequences or rare circumstances discussed in *Marten*, 2018 WL 2943251 at *3, and the Service has failed to provide a single case in support of such a tenuous position.[3]

---

[3] The Service also maintains that the 2013 proposed listing rule may be outdated and no longer include the best available science, but again, no details or specifics are provided. Additionally, any conferencing on wolverine going forward will not be hamstrung by scientific studies in the proposed rule (assuming, *arguendo*, they are outdated) but will need

Moreover, far from being new and disruptive, reinstating the wolverine's interim protective status is familiar territory for the Service. Wolverine were either a candidate species or proposed for listing over much of the last decade, from December 2010 to August 2014 (from the warranted finding to the first withdrawal of proposed rule) and from April 2016 to October 2020 (from *Defs. of Wildlife* to the second withdrawal of proposed rule). The Service is thus familiar with this interim protective status for wolverine and the regulatory landscape and requirements that accompany it. *See, e.g., Pascua Yaqui Tribe*, 2021 WL 3855977 at *5 (noting similar situation when evaluating disruptive consequences).

The Service's withdrawal has also only been intact for roughly sixteen months. Much like the water rule at issue in *In re Clean Water Act*, 2021 WL 4924844 at *8, this is an insufficient time for an agency to build up institutional reliance upon it. And, to the extent remand with vacatur of causes uncertainty in terms of the wolverine's listing status going forward after the remand period ends, such uncertainty exists

---

to utilize the best available science at the time the consultation occurs. 16 U.S.C. § 1536(c).

25

either way. "Regulatory uncertainty typically attends vacatur of any rule and it is insufficient to justify remand without vacatur." *Pascua Yaqui Tribe*, 2021 WL 3855977 at *5 (citation omitted).

### 3.   Interim protections for wolverine will be restored.

Third, as previously noted, if this Court orders remand with vacatur, important interim protections for wolverine will be restored and potential environmental harm avoided because, as the Service concedes (Doc. 44 at 24), wolverine will once again be deemed a species proposed for listing which comes with certain benefits designed to conserve the species pending a final listing decision.

For example, section 7(a)(4) requires informal conferencing on agency actions that are likely to jeopardize the continued existence of any species proposed to be listed. 16 U.S.C. § 1536(a)(4). This process "involves informal discussions between a Federal agency and the Service under section 7(a)(4) of the [ESA] regarding the impact of an action on proposed species . . . and recommendations to minimize or avoid adverse effects." 50 C.F.R. § 402.02. Section 7(c) of the ESA also requires species proposed for listing to be evaluated in biological assessments which are then evaluated by the Service as part of the

typical section 7 consultation process. 16 U.S.C. § 1536(c). All of this will surely benefit wolverine during the 18-month remand period. *See, e.g., Swan View Coal. v. Weber*, 783 F. App'x 675, 677 (9th Cir. 2019) (discussing additional analysis provided due to the wolverine's status as a species proposed for listing); *Native Ecosystems Council v. Marten*, 2020 WL 1479059, at *8 (D. Mont. 2020) (requiring additional analysis because of wolverine's status as a species proposed for listing).

Additional benefits will also be provided on National Forest System lands where much of the occupied wolverine habitat exists. 78 Fed. Reg. 7,864, 7,879 (February 4, 2013). For example, under the 2012 planning regulations, the Forest Service must determine whether forest plan components, i.e., standards and guidelines, provide the ecological conditions necessary to "conserve proposed and candidate species . . ." 36 C.F.R. § 219.9.(b)(1)(a). If they do not, then "additional, species-specific plan components, including standards and guidelines, must be included in the plan to provide such ecological conditions in the plan area." *Id.*

Under the regulations, the Forest Service has some discretion on how best to manage for species proposed for listing (by adopting a

coarse or fine filter approach) but it must ensure all forest plans provide for the ecological conditions necessary to "conserve" species proposed for listing. *Id.* This forest plan direction only applies to wolverine if the species remains proposed for listing. *Id.*

The Service insists that remand without vacatur is nonetheless appropriate because wolverine will still enjoy some protections in various forest plans and regions as a "species of conservation concern" or "sensitive species." Doc. 44 at 27-28.  But this is misleading and inaccurate.

Portions of the regions referenced by the Service (Doc. 44 at 27), including large portions of the Intermountain Region (Nevada and Utah), Rocky Mountain region (Colorado), and portions of the Northern Region (the Dakotas) remain unoccupied by wolverine so wolverine protections in those regions are of no benefit the species. Doc. 40 at ¶3. And, in the remaining portions of these regions where wolverine still occur, including the Northern Region (Montana and northern Idaho), few forest plans include *any* wolverine specific forest plan components.

The Flathead National Forest, which recently completed the revision process, does include some forest plan components specific to

wolverine but this is only because the species was proposed for listing at

the time the plan was revised. *See* Final ROD, Flathead Forest Plan.[4]

The Helena and Lewis and Clark National Forest also recently

completed the revision process. This forest initially included a detailed

analysis of wolverine in its biological assessment (when wolverine were

proposed for listing) but this analysis was later withdrawn after the

Service issued its withdrawal. *See* Supplement to Biological Assessment

at 2 (December, 2 2021).[5] "Because the proposed rule to list wolverine

was withdrawn in October 2020, this supplement [to the biological

assessment] does not include *any information* specific to the wolverine

analysis." *Id*. (emphasis added). The same thing happened on the

Custer Gallatin National Forest. *See* Final Biological Opinion (January

2022).[6] "Since issuance of the biological assessment, the proposed rule

---

[4] A copy of this document  is available at:
https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd607949.pdf
(last visited March 4, 2022).

[5] A copy of this document is available at:
https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd983161.pdf
(last visited March 4, 2022).

[6] A copy of this document is available at:
https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd990939.pdf
(last visited March 4, 2022).

to list wolverine has been withdrawn (October 13, 2020). Therefore, no further consultation related to wolverines is necessary." *Id*.

Further, in this region wolverine are not designated as a species of conservation concern – a classification which, aside from listing or proposed listing status, is necessary for specific forest plan management direction. *See* 36 C.F.R. § 219.9(b)(1) (directing the Forest Service to ensure that viable populations of species of conservation concern are maintained). The Northern Region specifically chose not to designate wolverine as a species of conservation concern and individual forests with wolverine populations that have concluded the forest plan revision process have taken the same approach.[7]

---

[7] *See*
https://www.fs.usda.gov/detail/r1/landmanagement/planning/?cid=fsepr
d500402 (website showing species of conservation concern designations in the region);
https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd887859.pdf
(letter noting wolverine are not a species of conservation concern on the Helena-Lewis and Clark forest);
https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd904370.pdf
(letter noting wolverine are not a species of conservation concern on the Flathead forest);
https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd904368.pdf
(letter noting wolverine not a species of conservation concern on the Custer-Gallatin forest) (last visited March 9, 2022).

The Service also erroneously states that wolverine are considered a "sensitive species." *See* Doc. 40 at 19. This too is misleading and incorrect. The Forest Service removed the wolverine from the sensitive species in the Rocky Mountain region in 2018 and has not restored that status since then.[8] The sensitive species designation has also been abandoned by the 2012 planning regulations and goes away when a national forest revises its forest plan under the 2012 planning regulations, as a number of forests in the Northern Region have done.[9]

The Service also maintains that some protections for wolverine are provided by state law. But many of the states or portions of the states listed, including California, large portions of Oregon, Colorado, large portions of Washington, Nevada, and Utah remain unoccupied by the species. Doc. 40 at ¶3. The Service also explains that no legal

---

[8] *See* https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd619539.pdf (wolverine removed from the sensitive species list)(last visited March 9, 2022).

[9] *See* https://www.fs.fed.us/naturalresources/documents/20160606-SCCDeputyChiefMemo2670_1900-508.pdf (memo noting sensitive species designations do not apply to forests that have revised their plans under the 2012 planning regulations) (last visited March 9, 2022).

trapping of wolverines is allowed in the contiguous United States (Doc.

44-1 at ¶6) and that they remain protected as a species of concern in

Montana. But wolverines are considered a "furbearer" in Montana and,

as such, can be subject to trapping. While the current trapping quota is

zero, this number is subject to change at any time and is likely to

change given the Service's withdrawal of the proposed listing rule.

Indeed, the only reason the current trapping quota is zero is because of

wolverine were previously deemed a candidate species proposed for

listing under the ESA (a classification they no longer have).[10]

This is why remand with vacatur is so important in this case.

Remand with vacatur will restore the wolverine's status as a species

proposed for listing which, as outlined above, is more than a label – it

---

[10] Under Montana law, the Montana Department of Fish, Wildlife and
Parks is directed to manage wildlife in a manner that prevents the need
for ESA listing and if the species is considered a "potential candidate for
listing" – as the wolverine was – the Department must work to
maintain and recover the species. §§ 87-1-201(9)(a)(i), (ii), MCA. This is
why, when the Department previously authorized trapping of wolverine
when they were a candidate species, a coalition of conservation groups
successfully challenged that decision and obtained a temporary
restraining order and eventual settlement based, in part, on the
Department's non-compliance with its duty to maintain and recover
wolverine. *See Helena Hunters and Anglers Associate v. Maurie*r, Case
BDV-2012-868 (1st Judicial District Montana).

results in real, on-the-ground interim protective measures for wolverine throughout their range in the contiguous United States.

## CONCLUSION

For these reasons, Guardians respectfully requests this Court deny the Service's request for remand without vacatur. This Court should grant the Service's remand request to issue a new decision within in 18-months but vacate the October, 2020 withdrawal of the proposed rule during the remand period.

Respectfully submitted this 11th day of March, 2022.

/s/ Matthew K. Bishop
Matthew K. Bishop

/s/ John R. Mellgren
John R. Mellgren

*Counsel for Guardians*

## CERTIFICATE OF COMPLIANCE

I, the undersigned counsel of record, hereby certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains less than 6,500 words. I relied on Microsoft Word to obtain the word count.

/s/ Matthew K. Bishop
Matthew K. Bishop