Timothy J. Preso
Amanda D. Galvan
Earthjustice
P.O. Box 4743
Bozeman, MT 59722-4743
(406) 586-9699
Fax: (406) 586-9695
tpreso@earthjustice.org
agalvan@earthjustice.org

*Attorneys for Plaintiffs Center for
Biological Diversity, et al.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | ) ) ) Lead Case No. CV 20–181–M–DWM |
| Plaintiffs, | ) |
| v. | ) Member Case No. ) CV 20-183-M-DWM |
| DEB HAALAND, et al., | ) |
| Defendants, | ) **RESPONSE TO FEDERAL** |
| and | ) **DEFENDANTS' MOTION** ) **FOR VOLUNTARY** |
| STATE OF IDAHO, by and through the Office of Species Conservation and the Idaho Fish and Game Commission, | ) **REMAND WITHOUT** ) **VACATUR AND REPLY IN** ) **SUPPORT OF MOTION** |
| Defendant-Intervenor. | ) **FOR SUMMARY** ) **JUDGMENT** |

WILDEARTH GUARDIANS, et al.,                    )
                                                )
                    Plaintiffs,                 )
                                                )
          v.                                    )
                                                )
DEB HAALAND, et al.,                            )
                                                )
                    Defendants.                 )
          and                                   )
                                                )
STATE OF IDAHO, by and through the              )
Office of Species Conservation and the          )
Idaho Fish and Game Commission,                 )
                                                )
                    Defendant-Intervenor.       )
                                                )

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

INTRODUCTION ..................................................................................1

ARGUMENT .........................................................................................3

I.     VACATUR IS WARRANTED UNDER GOVERNING
STANDARDS ..............................................................................3

       A.     The Service's Serious Errors Justify Vacatur .......................................6

       B.     Vacating the Withdrawal Would Not Result in Serious
Disruption to the Service but Would Likely Harm the
Wolverine ...........................................................................10

CONCLUSION ...................................................................................18

EXHIBIT 1: Order, Rock Creek All. v. U.S. Fish and Wildlife Serv., CV 01-152-
M-DWM (D. Mont. Mar. 19, 2002)

# TABLE OF AUTHORITIES
## FEDERAL CASES

All. for the Wild Rockies v. Marten,
    No. CV 17–21–M–DLC, 2018 WL 2943251 (D. Mont. June 12,
    2018) ..................................................................................... 3, 5, 11-12

All. for the Wild Rockies v. U.S. Forest Serv.,
    907 F.3d 1105 (9th Cir. 2018) ............................................................... 3

Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission,
    988 F.2d 146 (D.C. Cir. 1993) ..................................................... 4, 5, 6

ASSE Int'l, Inc. v. Kerry,
    182 F. Supp. 3d 1059 (C.D. Cal. 2016) ............................................... 5

Cal. by & Through Becerra v. Azar,
    501 F. Supp. 3d. 830 (N.D. Cal. 2020), appeal filed, No. 21-15091
    (9th Cir. Jan. 15, 2021) ...................................................................... 15

Cal. Cmties. Against Toxics v. EPA,
    688 F.3d 989 (9th Cir. 2012) ..................................................... 3, 4, 5

In re Clean Water Act Rulemaking,
    No. C 20-04636 WHA, et al., 2021 WL 4924844 (N.D. Cal. Oct.
    21, 2021), appeal filed, No. 21-16958 (9th Cir. Nov. 22, 2021). ......................... 5

Ctr. for Envtl. Health v. Vilsack,
    No. 15-cv-01690-JSC, 2016 WL 3383954 (N.D. Cal. June 20,
    2016) ............................................................................... 4, 10, 18

Defs. of Wildlife v. Jewell,
    176 F. Supp. 3d 975 (D. Mont. 2016) ................................................ 11

Dep't of Homeland Sec. v. Regents of the Univ. of California,
    140 S. Ct. 1891 (2020) ......................................................................... 9

Enos v. Marsh,
    769 F.2d 1363 (9th Cir. 1985), abrogated on other grounds by
    Marsh v. Or. Nat. Res. Council, 490 U.S. 360 (1989) ....................... 13

Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety and
    Health Admin.,
    920 F.2d 960 (D.C. Cir. 1990) ........................................................................6

Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic and Atm. Admin.
    Nat'l Marine Fisheries Serv.,
    109 F. Supp. 3d 1238 (N.D. Cal. 2015) .......................................................10

League of Wilderness Defs./Blue Mountains Biodiversity Project v.
    U.S. Forest Serv.,
    No. 3:10-CV-01397-SI, 2012 WL 13042847 (D. Or. Dec. 10,
    2012) ...............................................................................................................4

Nw. Envtl. Advocates v. EPA,
    No. 3:12-cv-01751-AC, 2018 WL 6524161 (D. Or. Dec. 12, 2018) .......4, 10, 18

Pascua Yaqui Tribe v. EPA,
    No. CV-20-00266-TUC-RM, 2021 WL 3855977 (D. Ariz. Aug.
    30, 2021), appeal filed, No. 21-16791 (9th Cir. Oct. 26, 2021) ...........................5

Pollinator Stewardship Council v. EPA,
    806 F.3d 520 (9th Cir. 2015) .......................................... 3, 3-4, 4, 6, 8

Rock Creek All. v. U.S. Fish and Wildlife Serv.,
    CV 01-152-M-DWM (D. Mont. Mar. 19, 2002) ...................................8

Swan View Coalition v. Weber,
    783 Fed. Appx. 675 (9th Cir. 2019) ...................................13, 14, 15

## STATUTES AND LEGISLATIVE MATERIALS

16 U.S.C. § 1533(b)(1)(A) ....................................................................2, 8
    § 1536(a)(2) ...............................................................................12
    § 1536(a)(4) ...............................................................................12, 13
    § 1536(d) ...................................................................................13

## REGULATIONS AND ADMINISTRATIVE MATERIALS

36 C.F.R. § 212 ...................................................................................17

    § 219.9(b)(1) .................................................. 16, 16-17, 18

    § 219.19 ...........................................................................18

50 C.F.R. § 402.10(c)...................................................................12, 13

    § 402.14(a) .................................................................. 12-13

**INTRODUCTION**

In response to Plaintiffs' opening presentation of summary judgment arguments, see ECF Nos. 37, 39, the defendants (collectively "U.S. Fish and Wildlife Service" or "the Service") offer no responsive argument to attempt to justify their challenged October 13, 2020 decision to withdraw a proposal to list the wolverine in the lower-48 states under the Endangered Species Act (the "Withdrawal").  Instead, the Service effectively confesses error in its failure to consider key scientific information regarding the wolverine-listing issue and requests remand.  See ECF No. 44 ("Service Br.") at 7-12.

As set forth in Plaintiffs' summary judgment brief, Plaintiffs agree with the Service that remand of the Withdrawal decision is appropriate.  ECF No. 39 at 31-35.  Further, although Plaintiffs' summary judgment brief advocates for a 12-month remand deadline, Plaintiffs take no issue with the Service's proposed 18-month deadline, Service Br. at 18, given the shortened litigation timeline resulting from the Service's acquiescence to remand without full briefing, argument, and resolution of summary judgment issues.

However, Plaintiffs oppose the Service's position that the Court should deny Plaintiffs' request to vacate the Withdrawal and instead should leave the Withdrawal in place while the agency reconsiders that decision.  See ECF No. 39 at 31-32 (Plaintiffs' vacatur request).  Contrary to the Service's arguments, vacatur

is warranted under the applicable standard for such relief.  First, the Service committed serious errors that justify vacatur.  The agency effectively admits to disregarding key scientific studies that represent the best available scientific information on pivotal conclusions underlying the Withdrawal.  See Service Br. at 11.  These serious errors violate a fundamental requirement of the ESA, see 16 U.S.C. § 1533(b)(1)(A) (requiring reliance on best available science), undermine the Service's conclusions, and therefore warrant vacatur.  Moreover, vacatur is especially appropriate here to avoid paving a path for the agency to use the remand process to craft an impermissible post-hoc rationalization for the challenged decision—a troubling prospect as the Service has now seen Plaintiffs' summary judgment arguments and has a strong incentive to develop new rationalizations for its challenged conclusions.

Vacatur is also warranted because restoring the wolverine's candidate status under the ESA would not be unduly disruptive, given that the applicable regulatory framework for species that are candidates for listing offers substantial flexibility to agencies attempting to comply with its requirements.  Yet failing to vacate the Withdrawal decision would deny the wolverine important regulatory protections in ongoing agency processes that promise to set the governing rules for wolverine habitat for years to come.  Accordingly, vacatur is both appropriate and necessary to avoid an inequitable and unjust result.

## ARGUMENT

## I.   VACATUR IS WARRANTED UNDER GOVERNING STANDARDS

Vacatur is appropriate here given the serious errors involved in the Service's failure to comply with the ESA, the lack of significant disruptive consequences that would flow from vacatur, and the potential for long-term negative impacts to the wolverine absent vacatur of the agency's flawed decision.

"[V]acatur of an unlawful agency action normally accompanies a remand." All. for the Wild Rockies v. U.S. Forest Serv., 907 F.3d 1105, 1121 (9th Cir. 2018).  Remand without vacatur is an unusual remedy, ordered "only in 'limited circumstances.'"  Pollinator Stewardship Council v. EPA, 806 F.3d 520, 532 (9th Cir. 2015) (quoting Cal. Cmties. Against Toxics v. EPA, 688 F.3d 989, 994 (9th Cir. 2012)).  "While the Ninth Circuit does not mandate vacatur, courts in the Ninth Circuit decline vacatur only in rare circumstances."  All. for the Wild Rockies v. Marten, No. CV 17–21–M–DLC, 2018 WL 2943251, at *2 (D. Mont. June 12, 2018) (quotation omitted).  These include circumstances where vacatur would risk environmental harm or when there exists no serious doubt as to whether the agency chose correctly and the agency could, simply by offering better reasoning or complying with procedural requirements, "adopt the same rule on remand."  Pollinator Stewardship Council, 806 F.3d at 532.  Absent such

3

circumstances, vacatur is the default remedy.  Id. at 532-33 (vacating challenged

agency action).

Because vacatur is the "ordinary remedy," the Service "bears the burden of

demonstrating vacatur is inappropriate."  Nw. Envtl. Advocates v. EPA, No. 3:12-

cv-01751-AC, 2018 WL 6524161, at *3 (D. Or. Dec. 12, 2018); see also Ctr. for

Envtl. Health v. Vilsack, No. 15-cv-01690-JSC, 2016 WL 3383954, at *13 (N.D.

Cal. June 20, 2016) ("[G]iven that vacatur is the presumptive remedy for a . . .

violation such as this, it is Defendants' burden to show that vacatur is

unwarranted.").

When weighing whether to vacate a challenged decision, Ninth Circuit

courts apply the two-part standard described in Allied-Signal, Inc. v. U.S. Nuclear

Regulatory Commission, 988 F.2d 146 (D.C. Cir. 1993).  The Allied-Signal test

evaluates both (1) the seriousness of the agency's errors, and (2) the potential

disruptive consequences of vacatur.  Cal. Cmties. Against Toxics, 688 F.3d at 992

(citing Allied-Signal, 988 F.2d at 150-51).  In other words, "courts may decline to

vacate agency decisions when vacatur would cause serious and irremediable harms

that significantly outweigh the magnitude of the agency's error."  League of

Wilderness Defs./Blue Mountains Biodiversity Project v. U.S. Forest Serv., No.

3:10-CV-01397-SI, 2012 WL 13042847, at *2 (D. Or. Dec. 10, 2012).  Otherwise,

vacatur should be ordered.  See id.

While vacatur is often considered following an adjudication on the merits, these same standards for ordering the vacatur remedy apply where a defendant federal agency requests voluntary remand of a challenged action.  See Cal. Cmties. Against Toxics, 688 F.3d at 992-94 (applying Allied-Signal test for vacatur where agency requested voluntary remand); accord Pascua Yaqui Tribe v. EPA, No. CV-20-00266-TUC-RM, 2021 WL 3855977, at *4 (D. Ariz. Aug. 30, 2021), appeal filed, No. 21-16791 (9th Cir. Oct. 26, 2021); All. for the Wild Rockies v. Marten, 2018 WL 2943251 at *2-3; ASSE Int'l, Inc. v. Kerry, 182 F. Supp. 3d 1059, 1064 (C.D. Cal. 2016).  Indeed, vacatur may be especially warranted where an agency seeks to circumvent the adjudication process through a request for voluntary remand, because "[l]eaving an agency action in place while the agency reconsiders may deny the petitioners the opportunity to vindicate their claims in federal court and would leave them subject to [an agency decision] they have asserted is invalid."  In re Clean Water Act Rulemaking, No. C 20-04636 WHA, et al., 2021 WL 4924844, at *4 (N.D. Cal. Oct. 21, 2021), appeal filed, No. 21-16958 (9th Cir. Nov. 22, 2021).

Here, vacatur is warranted.  Both Allied-Signal factors strongly support the ordinary remedy of vacatur due to the Withdrawal's serious flaws and the absence of disruptive consequences as a result of vacatur.

5

## A.    The Service's Serious Errors Justify Vacatur

First, vacatur is appropriate because the Service's errors seriously undermine the conclusions upon which the agency relied to support its Withdrawal decision. The seriousness of an agency's errors turns on "the extent of doubt whether the agency chose correctly." Allied-Signal, 988 F.2d at 150 (quoting Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety and Health Admin., 920 F.2d 960, 967 (D.C. Cir. 1990)). In other words, if the agency is likely to be able to justify its decision on remand, the errors were likely not serious and vacatur may not be appropriate. See id. at 150-51. But if the decision is likely to change on remand, vacatur is warranted to address the agency's serious errors while the agency reconsiders. Id.; see also Pollinator Stewardship Council, 806 F.3d at 532-533.

Here, Plaintiffs' summary judgment briefing recounts a host of serious Service errors in issuing the Withdrawal. See ECF No. 39 at 10-31. In response, the Service essentially admits error on crucial points, noting that it seeks remand to "consider new scientific information, including several studies raised by Plaintiffs in their [summary judgment motions]." Service Br. at 11. The Service specifically points to two studies—Mowat (2019), FWS0048770-783, and Sawaya (2019), FWS0049082-91—cited by Plaintiffs as important information bearing upon the Withdrawal decision. Id. As Plaintiffs argued in their summary judgment briefing,

these two studies directly undermine several of the Service's key findings.  Indeed, the Service's failure to consider these studies taints nearly all of the agency's conclusions related to the Lower-48 wolverine's status as a distinct population segment, including those addressing the wolverine's effective population size, ECF No. 39 at 18-19, genetic viability of the species, id. at 14, and marked separation of the lower-48 wolverine population from Canadian populations, id. at 29-30, as well as the Service's analysis, and ultimate dismissal, of the significant threats faced by the species, id. at 30.  An example illustrates the significant impacts of the Service's failure to consider these studies.  As Plaintiffs discussed in their opening brief, the Service's determinations regarding the wolverine's small population size and genetic viability in the lower-48 states relied heavily on the agency's conclusions that there are no significant barriers to wolverine movement between Canada and the contiguous United States.  See e.g., ECF No. 39 at 13-14, 18-19, 29-30.  These findings are directly contradicted by the Mowat (2019) study, which documented that trapping impacts in Canada present a significant obstacle to wolverine dispersal and movement across the U.S.-Canada border, id. at 14, 18-19, and the Sawaya (2019) study, which documented the barrier to north-south wolverine movement caused by the Trans-Canada Highway, id. at 14, 29-30.

The Service's admission that it failed to consider these key studies—which were published and available to the Service before it finalized its Withdrawal

decision—renders the Withdrawal fundamentally and substantively flawed.  The ESA requires the Service to make its listing determinations "solely on the basis of the best scientific . . . data available."  16 U.S.C. § 1533(b)(1)(A).  Here, the Service has effectively admitted that it failed to do so, and the scientific studies it disregarded support an outcome that is diametrically opposite to the conclusions reached by the agency on the issues to which the studies are relevant.  As a result of the Service ignoring these key studies—and contrary to the Service's arguments—there is no "'serious possibility' that the Service could lawfully justify its Withdrawal decision on remand."  Service Br. at 15.  A legitimate accounting of these studies will require the Service to perform a complete overhaul of its analysis which should produce a different outcome.  Accordingly, the Service's admitted failure to account for these key studies in its decision cannot be cured on remand merely by offering "better reasoning or . . . complying with procedural rules."  Pollinator Stewardship Council, 806 F.3d at 532.

Moreover, vacatur is particularly warranted here because allowing the Service to reevaluate its decision without vacatur paves the way for the agency to utilize the remand process to develop an unlawful post-hoc rationalization of its Withdrawal decision in an attempt to overcome these serious errors.  As this Court recognized in addressing a similar request by the Service in unrelated litigation, in the absence of withdrawal or vacatur of a challenged decision, an agency may

attempt to utilize a voluntary remand to impermissibly develop "post hoc reasoning

to defend its decision."  Order, <u>Rock Creek All. v. U.S. Fish and Wildlife Serv.</u>,

CV 01-152-M-DWM, at 2 (D. Mont. Mar. 19, 2002) (attached as Ex. 1).  Recent

Supreme Court precedent further underscores the danger that remand without

vacatur could result in unlawful post-hoc rationalization.  <u>See</u> <u>Dep't of Homeland</u>

<u>Sec. v. Regents of the Univ. of California</u>, 140 S. Ct. 1891, 1909 (2020).  As Chief

Justice Roberts explained:

> Requiring a new decision before considering new reasons promotes agency
> accountability by ensuring that parties and the public can respond fully and
> in a timely manner to an agency's exercise of authority.  Considering only
> contemporaneous explanations for agency action also instills confidence that
> the reasons given are not simply convenient litigating positions.  Permitting
> agencies to invoke belated justifications, on the other hand, can upset the
> orderly functioning of the process of review, forcing both litigants and
> courts to chase a moving target.

<u>Id.</u> (internal quotations omitted).  The danger of such a "moving target" is

especially acute here because Plaintiffs have filed their opening summary

judgment briefs and the Service has had an opportunity to fully review Plaintiffs'

merits-related arguments.  The Court should not accept the Service's request for a

remedy that could open the door for the agency to use Plaintiffs' summary

judgment briefs as a roadmap to develop post-hoc rationalizations in an effort to

salvage the unlawful Withdrawal.

      Ultimately, the seriousness of the Service's errors weighs heavily in favor of

vacating the Withdrawal.  In light of the fundamental substantive flaws in the

Withdrawal, any legitimate consideration of the overlooked science should change the decision on remand.  And, any attempt by the agency to do otherwise in these circumstances would be tainted by the prospect of impermissible post-hoc rationalization.  For these reasons, the Service has failed to meet its burden to establish that vacatur is inappropriate.  See Nw. Envtl. Advocates, 2018 WL 6524161 at *3; see also Ctr. for Envtl. Health, 2016 WL 3383954 at *13.

### B.   Vacating the Withdrawal Would Not Result in Serious Disruption to the Service but Would Likely Harm the Wolverine

The Service has also failed to demonstrate that vacatur would result in "serious and irremediable harms that significantly outweigh the magnitude of the [Service's] error."  Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic and Atm. Admin. Nat'l Marine Fisheries Serv., 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015) (citation omitted).  In an effort to demonstrate such disruptive consequences, the Service argues that returning to the pre-Withdrawal status quo would result in "confusion" and "uncertainty" due to the ESA's informal conferencing requirement.  Service Br. at 15-17.  However, this argument reflects a misguided and exaggerated depiction of ESA consultation requirements.  The Service also dismisses any prejudice to Plaintiffs or the wolverine, id. at 18, but this argument overlooks important long-term protections that would be forfeited by the wolverine during the 18 months that the Service reconsiders its admittedly flawed Withdrawal decision.  For these reasons, too, vacatur is warranted.

10

At the outset, the Service's argument that vacatur would result in confusion because it would return to the pre-Withdrawal status quo—i.e., the 2013 Proposed Listing—fails to pass muster.   First, the Service's argument that the 2013 Proposed Listing  "no longer [contains] the best available scientific information," id. at 17, rings hollow given that the agency's attempts to reverse the 2013 findings have been first overturned by a federal court ruling, see Defs. of Wildlife v. Jewell, 176 F. Supp. 3d 975, 1011 (D. Mont. 2016), and have now been left undefended by the Service itself in its remand request.  Indeed, Plaintiffs' summary judgment brief demonstrates point after point on which the Service's Withdrawal failed to rationally reverse the agency's earlier findings in support of the proposed wolverine listing, and the Service mounts no attempt to convince the Court otherwise.  See ECF No. 39 at 12-27.  The agency cannot credibly claim weakness in the 2013 findings when it has yet to sustain any rational reconsideration of them.

The Service's concern that "confusion" would be generated by a return to the prior regulatory framework embodied in the Proposed Listing, Service Br. at 15-16, also does not counsel against vacatur.  The Ninth Circuit has found disruptive consequences justifying remand without vacatur only where vacatur threatened truly severe impacts—such as potential extinction of a species or disruption of an entire power grid with associated environmental and economic harms.  See All. for the Wild Rockies v. Marten, 2018 WL 2943251 at *3

(discussing Ninth Circuit criteria for foregoing vacatur). Here, the Service identifies no such "calamities," id., but warns only of potential confusion and inefficiencies resulting from alleged disruption of ESA consultations. Service Br. at 17.

The Service's argument substantially overstates the potential for any such disruption. As the Service notes, reinstating the wolverine's candidate-species status would afford the wolverine certain protections under ESA Section 7(a)(4)'s conference requirement. Service Br. at 16-17. Contrary to the Service's argument, however, that requirement does not mandate "ESA consultations" equivalent to those required under Section 7(a)(2). Id. at 16. The plain language of Section 7(a)(4) imposes a duty on each federal agency to confer with a federal wildlife agency only "on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed under" ESA Section 4. 16 U.S.C. § 1536(a)(4); see also 50 C.F.R. § 402.10(c) (providing that a Section 7(a)(4) conference "shall consist of informal discussions concerning an action that is likely to jeopardize the continued existence of the proposed species"). By contrast, Section 7(a)(2) contains a more demanding requirement for federal agencies to engage in interagency consultation to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence" of any endangered or threatened species. Id. § 1536(a)(2) (emphasis added). This

Section 7(a)(2) consultation requirement applies to any federal agency action that "may affect listed species," 50 C.F.R. § 402.14(a), not only those that may jeopardize a species as under Section 7(a)(4).

Section 7(a)(4) also states that, unlike when consultations occur for listed species under ESA Section 7(a)(2), the conference mandate for candidate species "does not require a limitation on the commitment of resources" pending the completion of conferencing.  Compare 16 U.S.C. § 1536(a)(4) with 16 U.S.C. § 1536(d) (prohibiting, pending completion of consultation, any irreversible or irretrievable commitment of resources by action agency that would foreclose alternatives to avoid a jeopardy determination for listed species); see also Enos v. Marsh, 769 F.2d 1363, 1368-69 (9th Cir. 1985) (observing that Section 7(a)(4) conferencing requirement does not require federal agencies "to forego making resource commitments which could result in action adversely affecting the proposed species"), abrogated on other grounds by Marsh v. Or. Nat. Res. Council, 490 U.S. 360 (1989).  A Section 7(a)(4) conference yields "advisory recommendations, if any, on ways to minimize or avoid adverse effects."  50 C.F.R. § 402.10(c).

The Ninth Circuit addressed Section 7(a)(4) specifically as it applied to the candidate status of the wolverine in Swan View Coalition v. Weber, 783 Fed. Appx. 675 (9th Cir. 2019) (unpublished opinion).  Although an unpublished ruling,

Swan View sheds light on the foreseeable real-world consequences of restoring the wolverine's candidate-species status.  Swan View addressed an ESA challenge to a proposed timber sale in an area of the Flathead National Forest that is occupied by wolverines.  In rejecting that challenge, the Ninth Circuit stated that the only requirements arising from candidate-species status under the ESA are for the action agency to prepare a biological assessment to identify any such species that might be affected by the project, and then to confer with the U.S. Fish and Wildlife Service about the project.  Id. at 677.  The court then went on to specifically address what was required of the Forest Service to comply with Section 7(a)(4)'s requirements, and did so in a manner that illustrates the flexibility of those requirements: The Ninth Circuit held that the Forest Service's environmental analysis for the project under the National Environmental Policy Act satisfied the ESA's biological assessment requirement because it addressed effects of the project on wolverines, even though apparently no separate biological assessment was prepared.  Id. at 677-78.  The Ninth Circuit also held that the Forest Service adequately conferred with the Fish and Wildlife Service where the Fish and Wildlife Service had concurred in an earlier Forest Service determination that deemed logging activity unlikely to threaten conservation of the wolverine.  Id. at 678.

While the Service argues that some agencies might need to add new analysis to their biological assessments if the Withdrawal were vacated, Service Br. at 17, Swan View Coalition illustrates that agencies enjoy significant flexibility in satisfying the section 7(a)(4) conferencing requirement.  Further, any potential for disruption arising from such conferencing is lessened by the fact that the Proposed Listing was in place for a prolonged period before the challenged Withdrawal (from 2010 to 2014 and then again from 2016 to 2020, see ECF No. 40 at 86-102), so regulated parties have substantial experience with operating under that framework.  See Cal. by & Through Becerra v. Azar, 501 F. Supp. 3d. 830, 843 (N.D. Cal. 2020), appeal filed, No. 21-15091 (9th Cir. Jan. 15, 2021) (holding that vacatur was appropriate where it resulted in a return to a longstanding prior regulatory framework).  For these reasons, the Service's argument about the disruptive consequences of vacatur is unpersuasive.

Finally, the Service's argument that the wolverine faces no significant risk in the proposed 18-month remand period, Service Br. at 15, 18, overlooks important protections that the species will forfeit if the Withdrawal decision is left in place. Restoring the wolverine's candidate status would provide important interim protections for the wolverine.  As discussed supra, restoring such status would give wolverines the benefit of the Section 7(a)(4) conferencing requirement under the ESA, which will ensure that impacts to the wolverine are at least considered by

agencies proposing actions that might severely harm the species.  Moreover, the

wolverine's position as a candidate species could guarantee the species additional

protections across much of its range because of the Forest Service's planning

regulation requiring conservation measures for candidate species in forest plans.

36 C.F.R. § 219.9(b)(1) (requiring forest planning to "provide the ecological

conditions necessary to . . . conserve proposed and candidate species").  As the

Service observes, "[t]he majority of wolverine habitat in the contiguous United

States is on U.S. Forest Service land."  Service Br. at 19.  A number of Forest

Service land-management planning processes in areas that could impact wolverines

are currently underway or will soon begin—including the Salmon-Challis National

Forest (Idaho), Nez Perce-Clearwater National Forest (Idaho), and Bridger-Teton

National Forest (Wyoming).[1]  Absent vacatur of the Withdrawal decision, those

planning processes may conclude, or at least make significant progress, without

consideration of measures to protect wolverines as a candidate species under 36

---

[1] See Notice of Intent to Prepare an EIS for the Salmon-Challis National Forest,
available at
https://www.fs.usda.gov/detail/scnf/landmanagement/planning/?cid=fseprd589272;
see also Nez Perce-Clearwater National Forests Plan Revision available at
https://www.fs.usda.gov/detail/nezperceclearwater/landmanagement/planning/?cid
=stelprdb5447338; Planning for Bridger-Teton National Forest available at
https://www.fs.usda.gov/main/btnf/landmanagement/planning#:~:text=The%20Bri
dger-
Teton%20National%20Forest,travel%20planning%2C%20allotment%20managem
ent).

C.F.R. § 219.9(b)(1).  Indeed, during the likely remand period, the Nez Perce-Clearwater National Forest anticipates releasing a Final Environmental Impact Statement and the Salmon-Challis National Forest will likely begin its environmental review process.  These forest management plans could address key threats faced by the wolverine, including isolation, as the Forest Service manages much of the landscape between existing subpopulations, and winter recreation impacts, because the Forest Service sets the rules for snowmobiling.  <u>See</u> 36 C.F.R. § 212; <u>see also</u> ECF No. 39 at 16-27 (discussing threats from isolation); ECF No. 40 at 78-85 (documenting impacts to wolverines from winter recreation).  And because the plans last for many years, if not decades, the implications that any such deficient plans have for wolverine conservation extend well beyond the 18-month remand period.  In sum, vacating the Withdrawal would not yield significant

disruptions, but would provide the wolverine with incremental but important additional protections during the remand period.[2]

For these reasons, the Service's arguments are insufficient to justify departing from the ordinary remedy of remand with vacatur.  See Nw. Envtl. Advocates, 2018 WL 6524161 at *3 (holding that defendants bear the burden of demonstrating vacatur is inappropriate); see also Ctr. for Envtl. Health, 2016 WL 3383954 at *13 (same).  The Court should therefore remand and vacate the Withdrawal to ensure that the wolverine is protected as a candidate species while the Service revisits the flawed Withdrawal decision.

## CONCLUSION

For the foregoing reasons, the Court should vacate and remand the Withdrawal.

---

[2] The Service asserts that the Forest Service already protects wolverines as a species of conservation concern and a sensitive species.  Service Br. at 19. However, Forest Service planning regulations mandate measures to "conserve" candidate species, which means to "protect, preserve, manage, or restore" habitats so as to avoid listing of such species.  36 C.F.R. §§ 219.9(b)(1), 219.19 (emphasis added).  This is more protection than the agency affords species of conservation concern or sensitive species.  See 36 C.F.R. § 219.9(b)(1) (requiring plan components to "maintain a viable population" of species of conservation concern); Forest Serv. Manual 2670.22 (Sep. 23, 2005) (establishing similar objective for sensitive species) (available at https://www.fs.fed.us/im/directives/fsm/2600/2670-2671_clear.doc).

18

Respectfully submitted this 11th day of March, 2022.

/s/ Amanda D. Galvan

Amanda D. Galvan
Timothy J. Preso
Earthjustice
P.O. Box 4743
Bozeman, MT 59722-4743
(406) 586-9699
Fax: (406) 586-9695
agalvan@earthjustice.org
tpreso@earthjustice.org

*Attorneys for Plaintiffs Center for
Biological Diversity, et al.*

19

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(d)(2)(E), I hereby certify that this brief is in compliance with this Court's March 16, 2021 case management order, ECF No. 16, because it contains 3,968 words, excluding caption, certificate of compliance, tables of contents and authorities, and certificate of service.

/s/ Amanda D. Galvan
Amanda D. Galvan

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of March, 2022 I filed the foregoing document, along with all supporting materials and attachments, using the CM/ECF system, which caused counsel of record to be served electronically through this Court's CM/ECF system.

/s/ Amanda D. Galvan
Amanda D. Galvan