IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | Lead Case No. CV 20-181-M-DWM |
| Plaintiffs, | |
| and | Member Case No. CV 20-183-M-DWM |
| WILDEARTH GUARDIANS, et al., | |
| Consolidated Plaintiffs, | |
| v. | |
| DEBRA HAALAND, et al., | OPINION and ORDER |
| Federal Defendants, | |
| STATE OF IDAHO, by and through the Office of Species Conservation and the Idaho Fish and Game Commission, | |
| Defendant-Intervenor. | |

This case challenges the United States Fish and Wildlife Service's (the "Service") October 13, 2020 decision to withdraw the 2013 proposed rule to list wolverine as a threatened distinct population segment in the contiguous United States under the Endangered Species Act ("ESA"). For the reasons discussed below, the Service's motion for voluntary remand is granted, but with vacatur.

1

BACKGROUND[1]

## I.   The ESA Framework

To be protected by the ESA, a species must first be listed as endangered or threatened.  The ESA defines "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).  The ESA defines "species" to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16).  Thus, the ESA authorizes the Service to list as endangered or threatened a distinct population segment of vertebrate species.  While "distinct population segment" is not defined in the ESA and the term lacks a generally accepted scientific meaning, *see Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 842 & n.8 (9th Cir. 2003), the Service issued a policy interpretation that requires consideration of discreteness of the population in relation to the remainder of the species, the significance of the population segment to the species, and the population segment's conservation status in relation to the ESA's standards for listing, 61 Fed. Reg. 4,722, 4,725 (Feb. 7, 1996).  The Service must make its segment and other ESA determinations "solely on the basis of the

---

[1] Citations are to the lead case (CV 20–181–M–DWM) unless otherwise noted.

2

best scientific and commercial data available . . . after conducting a review of the status of the species." 16 U.S.C. § 1533(b)(1)(A).

To start the listing process, any "interested person" may petition "to add a species to, or remove a species from" the list of endangered or threatened species. *Id.* § 1533(b)(3)(A). Upon receipt of such a petition, the Service must generally make a finding within 90 days ("90-day finding") as to whether the petition presents "substantial scientific or commercial information indicating that the petition action may be warranted." *Id.* "If such a petition is found to present such information," the Service must commence a status review. *Id.* Following that review, the Service must, within 12 months, issue one of the following findings ("12-month finding"): (a) the petitioned action is not warranted; (b) the petitioned action is warranted; or (c) the petitioned action is warranted but precluded by higher-priority pending proposals. *Id.* § 1533(b)(3)(B); 50 C.F.R. § 424.14(h)(2). If the Service determines listing is warranted it must publish "a general notice and the complete text of a proposed regulation to implement" the listing. 16 U.S.C. § 1533(b)(3)(B)(ii), (b)(5)(A)(i). Within one year of that publication, the Service must publish either a final regulation, a notice of withdrawal with a finding on which the withdrawal is based, or a notice of a six-month extension. *Id.* § 1533(b)(6)(A)(i), (b)(6)(B).

## II.    The Proposed Rule

3

The Service's approach to the wolverine's status under the ESA has been inconsistent. In 2008, the Service concluded that the lower-48 wolverine population did not qualify as a distinct population segment and therefore did not warrant listing. 73 Fed. Reg. 12,929, 12,941 (Mar. 11, 2008). In 2010, the Service reversed course on the segment issue, but deemed further progress toward listing "precluded by higher priority listing actions." 75 Fed. Reg. 78,030, 78,037–40, 78,054 (Dec. 14, 2010). In 2013, the Service reaffirmed its conclusion that the lower-48 wolverine population was a distinct population segment and proposed to list the species as threatened. 78 Fed. Reg. 7,864, 7,873 (Feb. 4, 2013). But the Service withdrew the proposed listing in 2014. 79 Fed. Reg. 47,522, 47,523 (Aug. 13, 2014). Plaintiffs challenged the Service's 2014 decision under the ESA, and Judge Christensen vacated the withdrawal and remanded the decision for further agency consideration. *See Defs. of Wildlife v. Jewell*, 176 F. Supp. 3d 975 (D. Mont. 2016). Specifically, Judge Christensen remanded the matter to the Service to reevaluate its determination that climate change and small population size and low genetic diversity do not pose a threat to wolverine and revisit its application of its "significant portion of its range" policy. *Id.* at 1011.

Following the Court's decision, the Service initiated a review of the scientific literature and data on the North American wolverine. *See* FWS0014752–15173. That review culminated in the completion of a Species Status Assessment

in 2018 (the "Assessment"). *See* FWS0016818–996. In October 2020, the Service

issued the decision at issue here, once again withdrawing the 2013 proposed rule.

85 Fed. Reg. 64,618 (Oct. 13, 2020) (the "Withdrawal"). That decision is based on

the Service's conclusion that current and future threat factors "are not as

significant as believed at the time of the proposed rule" and that the lower-48

wolverine population does not qualify as a distinct population segment. *See id.*

## III.   The Present Case

In December 2020, two sets of plaintiffs sued the Service, challenging the

Withdrawal on numerous grounds under the ESA. (*See* Doc. 5; CV 20–183–M–

DWM, Doc. 1.) The Amended Complaint filed in CV 20–181–M–DWM asserts

two ESA violations, alleging that the Withdrawal is based on an unlawful distinct

population segment determination and an unlawful threat evaluation. The

Complaint filed in CV 20–183–M–DWM asserts five ESA violations, raising these

same two challenges, as well as alleging that the Service failed to use the best

available science, used a definition of "foreseeable future" that is inconsistent with

the ESA, and failed to evaluate whether the listing was warranted in a "a

significant portion of" the wolverine's range as required by *Defenders of Wildlife*.

In early 2021, the cases were consolidated, (Doc. 8), the State of Idaho

intervened as a matter of right, (Doc. 19), and a summary judgment briefing

schedule was set, (*see* Docs. 16, 25, 35). But after Plaintiffs filed their motions for

summary judgment in November 2021, (Docs. 36, 38), the Service filed a motion

for voluntary remand without vacatur, requesting an 18-month remand deadline,

(Doc. 43). Plaintiffs do not object to either remand or the proposed timeline, but

insist vacatur is necessary. (*See* Doc. 46 at 6; Doc. 47 at 7.) Idaho, on the other

hand, takes no position on remand or the timeline, but agrees with the Service that

the 2020 decision should remain in place. (*See* Doc. 45 at 2.) Thus, the question

before the Court is vacatur.

### ANALYSIS

Agencies have inherent authority to reconsider past decisions and to review

or replace them. *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009); *Cal.*

*Comms. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) ("A federal

agency may request remand in order to reconsider its initial action."). Generally,

such requests are only refused when "the agency's request is frivolous or made in

bad faith." *Cal. Comms.*, 688 F.3d at 992. Here, the propriety of remand is not at

issue. (*See* Doc. 46 at 6; Doc. 47 at 7.) And there is no indication that the

Service's request is frivolous or made in bad faith, as the Service has identified

valid reasons for remand: "(1) to re-examine the decision in light of the intervening

decision in *Center for Biological Diversity v. Haaland*, 998 F.3d 1061 (9th Cir.

2021) ("Pacific Walrus Decision"), and (2) to re-evaluate the decision in light of

new available scientific information." (Doc. 50 at 7.) The bone of contention is

vacatur.

The Service is correct that "[a] flawed rule need not be vacated" and "when

equity demands, the regulation can be left in place while the agency follows the

necessary procedures to correct its action." *Cal. Comms.*, 688 F.3d at 992

(quotation marks omitted). Nevertheless, "vacatur of an unlawful agency action

normally accompanies a remand." *All. for the Wild Rockies v. U.S. Forest Serv.*,

907 F.3d 1105, 1121 (9th Cir. 2018). "While the Ninth Circuit does not mandate

vacatur, courts in the Ninth Circuit decline vacatur only in rare circumstances."

*All. for the Wild Rockies v. Marten*, 2018 WL 2943251, at *2 (D. Mont. June 12,

2018) (quotation marks omitted). And because vacatur is the presumptive remedy,

the Service "bears the burden of demonstrating vacatur is inappropriate." *Nw.*

*Envtl. Advocates v. EPA*, 2018 WL 6524161, at *3 (D. Or. Dec. 12, 2018).

"Whether agency action should be vacated depends on how serious the

agency's errors are and the disruptive consequences of an interim change that may

itself be changed." *Cal. Comms.*, 688 F.3d at 992 (quotation marks omitted).

Courts "have also looked at whether the agency would likely be able to offer better

reasoning or whether by complying with procedural rules, it could adopt the same

rule on remand, or whether such fundamental flaws in the agency's decision make

it unlikely that the same rule would be adopted on remand." *Pollinator*

*Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015). And, in the environmental context, courts "consider whether vacating a faulty rule could result in possible environmental harm." *Id.*; *see, e.g., Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405–06 (9th Cir. 1995) (choosing not to vacate because setting aside endangered listing of snail species would risk potential extinction of the species).

Here, the Service argues that the 2020 Withdrawal should not be vacated for two reasons: (1) "there is a serious possibility that the Service could address Plaintiff's [sic] concerns after conducting its review and substantiate its decision on remand," and (2) "the disruptive consequences of vacating the withdrawal weigh in favor of remanding without vacatur." (Doc. 44 at 21.) Plaintiffs, on the other hand, argue that vacatur is warranted because the Service essentially admitted to "disregarding key scientific studies" and made errors that "violate the fundamental requirement of the ESA." (Doc. 47 at 8.) Plaintiffs are also concerned that the agency will use remand "to craft an impermissible post-hoc rationalization for the challenged decision." (*Id.*) According to Plaintiffs, "[t]he Service should not be allowed to have it both ways, i.e., be given the opportunity to re-work its decision while leaving it on the books." (Doc. 46 at 6.) Finally, the State of Idaho insists vacatur is not appropriate because it should not be bound by

the "stale science" of the 2013 proposed rule until a final listing decision is made. (Doc. 45 at 8.)  Plaintiffs have the better argument.

## I.      Serious Errors

The Service first argues that vacatur is not appropriate because, while it is going to reconsider the best available science and intervening Ninth Circuit case law on remand, "it is very possible that the Service could offer better reasoning and reach the same outcome."  (Doc. 44 at 22.)  Plaintiffs, on the other hand, insist that they have identified "a host of serious Service errors in issuing the Withdrawal" and that the agency has conceded at least some of these errors by volunteering to revisit its decision.  (Doc. 47 at 12.)  The Service disagrees that it has made any concessions and criticizes Plaintiffs' "attempt to litigate the merits of their claims." (Doc. 50 at 10.)  Ultimately, serious errors undermine the Service's decision.

The Service first attempts to limit the scope of the "serious errors" inquiry, insisting that "the Court should evaluate the seriousness of only the issues raised by the Service in support of its motion for voluntary remand when determining whether vacatur is appropriate here."  (*Id.* at 12.)  That argument is unpersuasive for a number of reasons, including the Service's own recognition that "[a]lthough a request by the government for voluntary remand does not require the Court to reach the merits, courts apply the same equitable analysis used to determine whether invalidated administrative actions should be vacated during the remand

9

period." (*See* Doc. 44 at 21–22 (citing *Nat. Res. Def. Council v. U.S. Dep't of the Interior*, 275 F. Supp. 2d 1136, 1143 (C.D. Cal. 2002)). Thus, consideration of the merits of Plaintiffs' challenges directly bears on whether vacatur is appropriate, whether the agency acknowledges those challenges or not. That is especially so here, where the Service makes clear that it "does not concede that it committed any error." (Doc. 50 at 10.) Moreover, if the agency has the ability to control the scope of vacatur, it could always avoid vacatur by basing its motion on purely procedural shortcomings even where an agency decision contained serious substantive errors. Thus, it is appropriate to consider the merits of Plaintiffs' challenges in assessing whether "serious errors" underlie the agency's decision.

But, even if that were not the case, the record here shows that the Service's own reasons for remand implicate the substantive scientific and factual basis of decision. The Pacific Walrus Decision casts doubt on the agency's previous interpretation of "foreseeable future," *see* 998 F.3d at 1070, and the studies referenced by the Service—Mowat (2019), FWS0048770–783, and Sawaya (2019) FWS0049082–91—undercut the agency's reliance on Canadian wolverines to establish connectivity, genetic diversity, and population density. As argued by Plaintiffs, "the Service's failure to consider these studies taints nearly all of the agency's conclusions related to the Lower-48 wolverine's status as a distinct population segment." (Doc. 47 at 13.) As such, "[t]hese concerns are not mere

10

procedural errors or problems that could be remedied through further explanation."

*Navajo Nation v. Regan*, ___ F. Supp. 3d ___, 2021 WL 4430466, at *3 (D.N.M.

Sept. 27, 2021) (quotation marks omitted); *see also Pascua Yaqui Tribe v. U.S.

EPA*, 557 F. Supp. 3d 949, 955 (D. Ariz. 2021).  Moreover, while the Service is

correct that it has discretion over the weight afforded to scientific studies and the

determination of the best available science, *see* 16 U.S.C. § 1533(b)(1)(A);

*Ecology Ctr. v. Castaneda*, 574 F.3d 652, 659 (9th Cir. 2009), it is troubling that

the scientific studies that the agency now contends warrant further review existed

at the time the Service made its 2020 decision but were not considered.

The Service maintains, however, that "it is very possible that the Service

could offer better reasoning and reach the same outcome."  (Doc. 44 at 22.)  But

Plaintiffs are correct that in doing so, the agency would be providing new

substantive justifications for its existing decision, turning the administrative

process on its head.  *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140

S. Ct. 1891, 1909 (2020) ("Permitting agencies to invoke belated justifications . . .

can upset the orderly functioning of the process of review, forcing both litigants

and courts to chase a moving target.").  And based on the Service's own

conceptualization of why remand is appropriate, the "fundamental flaws in the

agency's decision make it unlikely that the same rule would be adopted on

remand." *Pollinator*, 806 F.3d at 532.

The seriousness of the Withdrawal's deficiencies weighs in favor of vacatur.

## II.    Disruptive Consequences

The Service further argues that vacatur "will result in disruptive consequences that outweigh any benefits of such a remedy." (Doc. 44 at 23.) More specifically, the Service insists that "[v]acatur will reanimate the Proposed Rule and would result in confusion and uncertainty for the public, federal agencies, and other stakeholders." (*Id.*) Plaintiffs, on the other hand, argue that the Service exaggerates the administrative impact and minimizes the threat to the wolverine. Plaintiffs once again have the better argument.

As a preliminary matter, the consequences identified by the Service are a far cry from the "measure for the level of severity of consequences" that have prompted remand without vacatur in other cases. *See Marten*, 2018 WL 2943251, at *3 (noting, for example, regional power outages). Nor do they "'set[] back the achievement of the environmental protection required' by statute." *Navajo Nation*, 2021 WL 4430466, at *4 (quoting *Nat. Res. Def. Council v. EPA*, 489 F.3d 1364, 1374 (D.C. Cir. 2007)); (*see* Doc. 46 at 26 (collecting cases)). To the contrary, vacatur would further, rather than set back, the goals of the ESA. And the administrative consequences alleged here do not fall within the same class as those that generally support a finding of unacceptable disruption. *See Pascua Yaqui*

*Tribe*, 557 F. Supp. 3d at 956 ("[R]egulatory uncertainty typically attends vacatur of any rule and is insufficient to justify remand without vacatur.").

Additionally, the alleged administrative burden is, as argued by Plaintiffs, overstated.  To be sure, if the Withdrawal is vacated, the 2013 proposed listing rule goes back into effect.  And, as a "proposed" species, wolverines would be eligible for consultation under ESA Section 7, *see* 16 U.S.C. § 1536(a)(4); 50 C.F.R. § 402.10, which would then require their consideration in environmental decision documents such as biological assessments, *see* 50 C.F.R. § 402.12(a).  But, contrary to the Service's characterization, the wolverine's inclusion in this standard procedural process will not sow confusion, or at least no more confusion than that already sown by the agency's own inconsistency as to the species' status.  And, as argued by Plaintiffs, agencies have significant flexibility in satisfying the Section 7(a)(4) requirements, and are already familiar with the wolverine's "proposed" status, as it was in place between 2013–2014 and 2016–2020.  In that same vein, the wolverine's current status (not proposed for listing) has been in effect for less than two years.  *See Becerra v. Azar*, 501 F. Supp. 3d 830, 843 (N.D. Cal. 2020) (finding minimal disruption where vacating the agency's new payroll policy "simply preserves a status quo that has existed since at least the early 1990's while the agency takes the time it needs to give proper consideration to the matter"); *In re Clean Water Act Rulemaking*, ___ F.3d ___, 2021 WL 4924844, at *8 (N.D.

Cal. Oct. 21, 2021) (finding 13 months an "insufficient time for institutional reliance to build up around the current rule").

Equally unconvincing is the Service's contention that the current status of the wolverine is such that it would not benefit from the restoration of the 2013 proposed rule during remand. There is no dispute that as a "proposed" species, the wolverine would receive the protections afforded by the ESA, protections it does not receive now. The real-world impact of that protection is only made more apparent by the number of pending forest plans, (*see* Doc. 47 at 22), and Idaho's assertion that the proposed listing will interfere with its management plans. Nor would it be proper, as Idaho asks, for this Court to weigh the science underlying the 2013 rule in assessing the current status.

Based on the above, the Service fails to show that the disruptive consequences outweigh the benefits of vacatur in this case.

## III.   Deadline for Remand

Finally, the Service asks that the Court not impose a deadline for remand, but that if it does so, "the deadline for submitting a new final listing determination to the Federal Register [should] be 18 months from entry of Judgment." (Doc. 44 at 29.) Plaintiffs do not object to the 18-month deadline proposed by the Service. (*See* Doc. 46 at 6; Doc. 47 at 7.) The relevant considerations in setting a deadline for an agency are "(1) whether the 'budgetary' and 'manpower demands' required

14

are 'beyond the agency's capacity or would unduly jeopardize the implementation of other essential programs'; and (2) an agency's need to have more time to sufficiently evaluate complex technical issues." *California v. U.S. EPA*, 385 F. Supp. 3d 903, 909 (N.D. Cal. 2019) (quoting *Nat. Res. Def. Council v. Train*, 510 F.2d 692, 712–13 (D.C. Cir. 1974)).  Based on the agency's own assessment of its resources, an 18-month deadline is appropriate here.

## CONCLUSION

Based on the foregoing, IT IS ORDERED:

(1)     Plaintiffs' motions for summary judgment (Docs. 36, 38) are DENIED without prejudice.

(2)     The Service's motion for voluntary remand (Doc. 43) is GRANTED in PART and DENIED in PART.  The 2020 Withdrawal is VACATED, and the matter is REMANDED to the agency to submit a new final listing determination to the Federal Register within 18 months from entry of Judgment.

DATED this 26th day of May, 2022.

15:37 P.M.

Donald W. Molloy, District Judge
United States District Court